CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

2011 AUG -8  PM 4: 17

DEPUTY CLERK _____

PREM SALES, LTD.

               Plaintiff,

    v.

SANYO ELECTRIC AIR CONDITIONING CO.,
LTD.;
And
SANYO AIR CONDITIONERS
MANUFACTURING, SINGAPORE, PTE.,
LTD.;
And
SANYO ELECTRIC CO., LTD.;
And
BUSINESS ENTITY DOES 1-10;

               Defendants.

**Civil Action No. 5:11-CV-136-C**

---

## MOTION BY SANYO ASIA PTE LTD FOR ORDER TO QUASH SERVICE AND/OR DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION AND DISMISS OR STAY ALL CLAIMS AND BRIEF IN SUPPORT OF SAME

       SANYO Air Conditioners Manufacturing, Singapore, Pte., Ltd. ("SAMS"), one of the named

defendants in this litigation, no longer exists as a legal entity.  On October 1, 2009, SAMS was merged

into SANYO Asia Pte., Ltd. ("SA").  Despite being aware of this fact, Plaintiff Prem Sales, Ltd.

("Prem Sales") attempted to serve the complaint and summons in this action on "SANYO Air

Conditioners Manufacturing, Singapore, Pte., Ltd." by serving the Texas Secretary of State.  SA

therefore now moves for an order that service on SAMS be quashed or dismissed pursuant to Fed. R.

Civ. P. 12(b)(4) for failing to name or serve a valid entity.

       In the alternative, Defendant SA moves for an Order to (a) compel arbitration of all of

Plaintiff's claims pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* and to dismiss or stay

tk-415706

this case pending the outcome of the arbitration, and/or (b) stay this action pursuant to 9 U.S.C. § 3 or pursuant to this Court's inherent authority over its own docket.

# TABLE OF CONTENTS

**Page**

I.   MOTION TO QUASH OR DISMISS COMPLAINT FOR FAILURE TO NAME
     AN EXISTING ENTITY ............................................................................................... 1

II.  FACTUAL AND PROCEDURAL BACKGROUND REGARDING MOTION
     TO COMPEL ARBITRATION ..................................................................................... 2

     A.   The SANYO Entities ......................................................................................... 3

     B.   The Prem Entities ............................................................................................... 3

     C.   The PTAC Distribution Agreement ................................................................... 4

     D.   Transfer of the PTAC Distribution Agreement from SEAC to SANYO
          Electric ............................................................................................................... 4

     E.   Prem Sales Has Acted As If it Were Party to the Distribution Agreement ........... 5

     F.   Assignment by Operation of Law Resulting from Merger of SAMS into
          SA ....................................................................................................................... 5

     G.   SANYO Notified Prem of Its Intention to Exit from PTAC Business in
          June 2009 ........................................................................................................... 5

     H.   SANYO Discussed Options for Ending the PTAC Business in August
          2009 .................................................................................................................... 6

     I.   Prem Sales and Guangdong Sanyo Enter into an Agreement for the Sale of
          PTAC Tooling ..................................................................................................... 7

     J.   Guangdong Sanyo Delivered Most of the Tooling in May 2010 ........................... 8

     K.   Official Termination of Distribution Agreement .................................................. 8

     L.   Prem's Allegations Against SANYO ..................................................................... 9

     M.   JCAA Arbitration ................................................................................................. 9

     N.   Texas Complaint ................................................................................................ 10

     O.   All SANYO Entities are Ready Willing and Able to Participate in
          Arbitration in Hong Kong and Japan ................................................................ 11

III. ARGUMENT REGARDING MOTION TO COMPEL ARBITRATION ..................... 11

     A.   The Federal Arbitration Act Calls for a Mandatory Stay and the Court has
          Discretion to Dismiss This Action if the Court Finds That the Issues are
          Referable to Arbitration .................................................................................... 12

     B.   Each Claim in this Matter is Referable to Arbitration Because the Tooling
          Agreement Contains a Broad Arbitration Clause and Because Prem Sales
          is Equitably Estopped from Avoiding That Arbitration Clause .......................... 14

i

**TABLE OF CONTENTS**
**(continued)**

Page

    1.    The Tooling Agreement contains a broad arbitration provision that covers each claim in this dispute ............................................................. 14

    2.    The "Lubbock contract" arises out of or in connection with the Tooling Agreement ...................................................................................... 16

    3.    Prem Sales is a party to the Tooling Agreement and should be equitably estopped from avoiding its broad arbitration provision because each claim relies on the terms of the Tooling Agreement.......... 17

    4.    Plaintiff is bound by the Tooling Agreement's arbitration provision because Plaintiff alleges substantially interconnected and concerted misconduct between SANYO and Guangdong Sanyo, a party to the Tooling Agreement ...................................................................................... 19

    5.    Plaintiff's allegations that the Tooling Agreement is invalid are for an arbitrator to decide because Plaintiff does not allege the arbitration provision in particular was a result of fraud or misrepresentation ....................................................................................... 20

    C.    SANYO Electric and SANYO Asia Have Initiated Arbitration Before JCAA Pursuant to the Distributorship Agreement and the Court Should Stay This Litigation Pending the Outcome of That Arbitration .......................... 21

    1.    SANYO is entitled to a mandatory stay because the claims in this action and in related arbitrations involve the same operative facts and are inherently inseparable and because this action is likely to have a critical impact on the arbitrations .................................................. 21

    2.    This Court should grant a discretionary stay even if no mandatory stay is warranted because the claims significantly overlap with claims raised in arbitration and this action will have some impact on the arbitrations .................................................................................. 23

IV.    CONCLUSION............................................................................................. 24

ii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alford v. Dean Witter Reynolds, Inc.,*
    975 F.2d 1161 (5th Cir. 1992) ...................................................................12

*Bowman v. Sandofi-Aventis,*
    No. A-09-CA-192-SS, 2009 U.S. Dist. LEXIS 122705 (W.D. Tex. Apr. 16, 2009)................3

*Brown v. Pac. Life Ins. Co.,*
    462 F.3d 389 (5th Cir. 2006) ..............................................................12, 14, 17, 18, 19, 20

*Buckeye Check Cashing, Inc. v. Cardegna,*
    546 U.S. 440 (2006)..................................................................................20

*Dr. Pepper Bottling Co. of Tex., Inc. v. Presidential Life Ins. Co.,*
    No. 3-01-CV-2168-R, 2002 U.S. Dist. LEXIS 4196 (N.D. Tex. Mar. 11, 2002)...................18

*Grigson v. Creative Artists Agency, LLC,*
    210 F.3d 524 (5th Cir. 2000) .....................................................................19

*Harvey v. Joyce,*
    199 F.3d 790 (5th Cir. 2000) .....................................................................14

*Hill v. GE Power Sys. Inc.,*
    282 F.3d 343 (5th Cir. 2002) .....................................................................12

*Hornbeck Offshore (1984) Corp. v. Coastal Carriers Corp.,*
    981 F.2d 752 (5th Cir. 1993) .....................................................................14

*In re Devon Energy Corp.,*
    332 S.W.3d 543 (Tex. App. 2009)...................................................................13

*Med-IM Dev., Inc. v. GE Capital Corp.,*
    No. H-07-1618, 2008 U.S. Dist. LEXIS 25635 (S.D. Tex. Mar. 31, 2008) ...............13, 23, 24

*Midwest Mechanical Contractors, Inc. v. Commonwealth Constr. Co.,*
    801 F.2d 748 (5th Cir. 1986) .....................................................................12

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.,*
    526 U.S. 344 (1999)...............................................................................2, 3

*Neely v. Khurana,*
    No. 3:07-CV-1344-D, 2008 U.S. Dist. LEXIS 112134 (N.D. Tex. Mar. 12, 2008)................3

tk-415706

*Pennzoil Exploration & Prod. Co. v. Ramco Energy*,
    139 F.3d 1061 (5th Cir. 1998) ...................................................................................14, 15, 16

*Safer v. Nelson Fin. Grp.*,
    422 F.3d 289 (5th Cir. 2005) .................................................................................................14

*Salad Bowl Franchise Corp. v. Crane*,
    No. 3:11-CV-0043-D, 2011 U.S. Dist. LEXIS 27406 (N.D. Tex. Mar 17, 2011)...................18

*SDB Trade Int'l, L.P. v. E&E Grp, LLC*,
    No. H-08-226, 2008 U.S. Dist. LEXIS 101302 (S.D. Tex. May 15, 2008).............................15

*Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A.*,
    372 F.3d 339 (5th Cir. 2004) ...........................................................................................13, 21


**STATUTES**

9 U.S.C. § 3.....................................................................................................................12, 13

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA").........................................................1


**OTHER AUTHORITIES**

Fed. R. Civ. P. 4(a)(1)(A)-(B)....................................................................................................3

Fed. R. Civ. P. 12(b)(4)..............................................................................................................1

Tex. R. Civ. P. 99(b)(7)-(8) .......................................................................................................3

iv

## I.   MOTION TO QUASH OR DISMISS COMPLAINT FOR FAILURE TO NAME AN EXISTING ENTITY

Defendant SANYO Asia Pte., Ltd.'s ("SA") first moves to Quash Service and/or Dismiss the Complaint for Failure to serve a valid entity pursuant to Fed. R. Civ. P. 12(b)(4).  On July 15, 2011, SA received a copy of the complaint and summons in this action, which had been served on the Texas Secretary of State on July 5, 2011.  (Declaration of Kazuhisa Miike in Support of Defendant's Motion for an Order to Quash Service and/or Dismiss or, in the Alternative, to Compel Arbitration and Dismiss or Stay All Claims ("Miike Decl.") ¶ 3, App. 26; Ex. A,  App. 29.)  The complaint and summons were directed to SAMS.  No such entity exists; SAMS was merged into SA on October 1, 2009.  (Declaration of Azman Hisham Bin Jaafar in Support of Defendant's Motion for an Order to Quash Service and/or Dismiss or, in the Alternative, to Compel Arbitration and Dismiss or Stay All Claims ("Jaafar Decl.") ¶ 5, Ex. C,  App. 86-87, 98, Declaration of Akira Nakai in Support of Defendant's Motion for an Order to Quash Service and/or Dismiss or, in the Alternative, to Compel Arbitration and Dismiss or Stay All Claims ("Nakai Decl.") ¶ 8, App. 100).

"Before a ... court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999).  To date, not one of the three Defendants in this litigation has been validly served.  This motion sets out the grounds for lack of personal jurisdiction against SA.  The procedural defects for service on the other two Japan-based entities are explained in the Motion to Dismiss or Quash filed concurrently by SANYO Electric Co., Ltd. and SANYO Electric Service Co., Ltd. (and brought on different grounds from those that apply to SA).

Under both the Texas and Federal Rules of Civil Procedure, a summons must include the names of the parties, among other things, and must be directed to the defendant being sued.  *See, e.g.,*

Fed. R. Civ. P. 4(a)(1)(A)-(B); Tex. R. Civ. P. 99(b)(7)-(8).  Thus, process may be insufficient if the summons and complaint refer to a party by the wrong name.  *Id.*; *Bowman v. Sandofi-Aventis*, No. A-09-CA-192-SS, 2009 U.S. Dist. LEXIS 122705, at *2 (W.D. Tex. Apr. 16, 2009).  As proper process is required to establish jurisdiction, this court must quash service and/or dismiss the complaint with respect to SAMS for failure to name the correct defendant.  *Murphy Bros.*, 526 U.S. at 350.

## II.   FACTUAL AND PROCEDURAL BACKGROUND REGARDING MOTION TO COMPEL ARBITRATION

If and when this Court obtains personal jurisdiction, then we invite the Court to consider the following alternative motion to compel arbitration and/or stay or dismiss this litigation.

### A.   The SANYO Entities

This case has been brought against three SANYO entities:

(a) SANYO Electric Air Conditioning Co., Ltd. ("SEAC") was a Japanese entity with operations in Tochigi, Japan.  (Nakai Decl. ¶ 2, Ex. A, App. 99, 104.)  SEAC engaged in the sale of Packaged Terminal Air Conditioners ("PTACs") until April 1, 2004, when it transferred that business to SANYO Electric Co., Ltd. ("SANYO Electric").  (Nakai Decl. ¶ 2, Ex. A, App. 99, 102.)  From this point forward, SEAC was no longer involved in the PTAC business.  (Nakai Decl. ¶ 9, App. 100.)  SEAC's current name is "SANYO Electric Service Co., Ltd." (Nakai Decl. ¶ 6, App. 100, Declaration of Malcolm Dort in Support of Defendant's Motion for an Order to Quash Service and/or Dismiss or, in the Alternative, to Compel Arbitration and Dismiss or Stay All Claims ("Dort Decl.") ¶ 10, Ex. J, App. 142, 202-214.)

(b) SANYO Electric is famous worldwide for its consumer electronics and other products. (Declaration of Tetsushi Yamashita in Support of Defendant's Motion for an Order to Quash Service and/or Dismiss or, in the Alternative, to Compel Arbitration and Dismiss or Stay All Claims ("Yamashita Decl.") ¶ 4, App. 220.)   It entered the PTAC business in 2004, when it took over that

tk-415706

business from SEAC.  (Yamashita Decl. ¶ 6, App. 220.)  SANYO Electric is the ultimate parent company of all of the other SANYO entities related to this dispute.  (Yamashita Decl. ¶ 4, App. 220.)  Since at least 2004, SANYO Electric has been the primary point of contact in business dealings with Prem Sales.  (Yamashita Decl. ¶ 7, App. 220.)

(c) SAMS was a Singaporean entity that engaged in the manufacture of PTACs until October 1, 2009, when it merged into SA.  "Jaafar Decl." ¶ 2, 5,  App. 86, 87.)  SA has approximately 35 employees and operates in the consumer electronics industry.   (Miike Decl. ¶ 2,  App. 25.)  SA currently supplies PTAC parts to Plaintiff Prem Sales and its affiliates.

In addition, although not named as a party, there is another SANYO entity that is relevant to this dispute:  Guangdong Sanyo Air Conditioner Co., Ltd. ("Guangdong Sanyo").

(d) Guangdong Sanyo is a company headquartered in Guangdong, China.  (Declaration of Katsumi Morito in Support of Defendant's Motion for an Order to Quash Service and/or Dismiss or, in the Alternative, to Compel Arbitration and Dismiss or Stay All Claims ("Morito Decl.") ¶ 2, App. 1.)  Guangdong Sanyo manufactured PTACs to be supplied to Prem and it sold part of its manufacturing tooling to Prem in late 2009.  (Morito Decl. ¶ 4,  App. 2.)

### B.    The Prem Entities

Plaintiff, Prem Sales, Ltd., now Prem Sales, LLC ("Prem Sales") is the main Prem entity that has been doing business with SANYO (Yamashita Decl. ¶ 7-13, App. 220-221).  Although SANYO Electric has only been dealing with Prem Sales for the past few years, there is another entity, Prem Supply, Inc. that used to be involved in the PTAC business (collectively "Prem").  Prem Supply converted to Prem Warehouse, Inc. in May 2010 and then to Prem Warehouse, LLC in December 2010.  (Dort Decl. ¶ 4, Ex. D, App. 155-167.)  Both Prem entities are owned and run by Henry Patel, and Prem Sales and Prem Supply are registered to do business at the same address.  (Dort Decl. ¶¶ 3, 4, App. 144-167.)

3

Prem Sales has approximately 20 employees. (Yamashita Decl. ¶ 5, App. 220.) Mr. Patel has been the primary point of contact in business dealings between Prem and the SANYO entities. (Yamashita Decl. ¶ 7, App. 220-221.) As far as the SANYO entities were concerned, they were doing business with Prem Sales; who had assumed all the responsibilities under the Distribution Agreement (Yamashita Decl. ¶¶ 7-9, App. 220-221.)

### C.    The PTAC Distribution Agreement

On October 28, 2002, SEAC and SAMS entered into a Purchase and Sales Agreement ("Distribution Agreement") with Prem Supply, under which the SANYO entities agreed to sell PTACs and related service parts to Prem Supply. (Nakai Decl. ¶ 3, App. 100; Miike Decl. Ex. B, App. 65-84.) The Distribution Agreement automatically renewed for successive one-year terms unless either party notified the other of its intention to terminate two months before the end of the renewal term. (Miike Decl. Ex. B, art. 17, App. 79.)

The Distribution Agreement's arbitration provision reads:

21.01  In the event of *any disputes*, *differences* or *controversies* should arise [*sic*] between the parties hereto, *out of or in relation to or in connection with the provisions of this Agreement*, or *any action* taken hereunder, the parties hereto shall thoroughly explore all possibilities for amicable settlement (emphasis added).

21.02  In case amicable settlement could not be reached, *such disputes*, *differences or controversies shall be referred to arbitration* in Osaka, Japan in accordance with the Commercial Arbitration Rules of the Japan Commercial Arbitration Association... (emphasis added).

(Miike Decl. Ex. B, art. 21, App. 82.)

### D.    Transfer of the PTAC Distribution Agreement from SEAC to SANYO Electric

In 2004, SEAC assigned its rights and obligations under the Distribution Agreement to SANYO Electric. (Nakai Decl. ¶ 4, App. 100.) Starting by at least 2005, all invoices to Prem were issued by SANYO Electric. (Yamashita Decl. ¶ 8, Ex. I, J, K, L, M, and N, App. 221, 269-281.)

4

Similarly, purchase orders from Prem were addressed to "SANYO Gunma." Gunma is the location in Japan where SANYO Electric's Air Conditioning Division is located.  (Yamashita Decl. ¶ 9, Ex. C, D, and E, App. 221, 256-262.)  Prem was therefore aware at all relevant times that it was dealing with SANYO Electric.

### E.   Prem Sales Has Acted As If it Were Party to the Distribution Agreement

Prem Sales has been performing under, and taking advantage of, the Distribution Agreement, notwithstanding the fact that on its face, Prem Supply, not Prem Sales, is party to the Distribution Agreement.  All Purchase Orders from Prem were issued either jointly by Prem Sales and Prem Supply, or by Prem Sales alone.  (Yamashita Decl. ¶ 8, Ex. C, D, E, F, G, and H, App. 221, 256-268.)  In the Purchase Orders where both Prem Sales and Prem Supply are named, these two Prem entities are the issuers of the Purchase Order, and the ordered goods are directed to be shipped to Prem Sales. (Yamashita Decl. ¶ 8, Ex. C, D, E, App. 221, 256-262.)  In more recent Purchase Orders issued to an intermediary company called Veelam Import/Export Co. Ltd. ("Veelam"), Prem Sales alone is the issuer as well as recipient of the goods.  (Yamashita Decl. ¶ 8, Ex. F, G, and H, App. 221, 263-268.) Furthermore, at least since 2005, all invoices issued by SANYO Electric identify Prem Sales, either as the buyer or the consignee.  (Yamashita Decl. ¶ 8, Ex. J, K, M, and N, App. 221, 272-281.)

### F.   Assignment by Operation of Law Resulting from Merger of SAMS into SA

On October 1, 2009, SAMS merged into SA, causing SA to become party to the Distribution Agreement.   (Miike Decl. ¶ 5, App. 26; Jaafar Decl. Ex. C, App. 86-87, 98.)

### G.   SANYO Notified Prem of Its Intention to Exit from PTAC Business in June 2009

In June, Koji Mori, Susumu Sato, and Tetsushi Yamashita, all employees of SANYO Electric, and Mr. Henry Patel of Prem met at Prem's office in Lubbock, Texas.  (Declaration of Koji Mori in Support of Defendant's Motion for an Order to Quash Service and/or Dismiss or, in the Alternative, to

tk-415706

Compel Arbitration and Dismiss or Stay All Claims, ¶ 2, Ex. A, B, and C, App. 127-135.)  At these meetings, SANYO Electric gave Prem notice that SANYO intended to exit the PTAC business, but it did not officially terminate the Distribution Agreement.  *Id.*  The parties also discussed ways in which Prem could continue to stay in the PTAC business.  Prem Sales claims in its complaint that the discussions at these meetings, along with subsequent e-mails, constitute a "contract (between merchants)."  (Compl. ¶ 18.2.)  SANYO disputes this contention and believes the meetings were merely a discussion about the termination of the Distribution Agreement and the consequences of that action.  (Mori Decl. ¶ 2, App. 124-125.)  The minutes of this meeting are attached to Prem's complaint as Exhibit A, and they are included in the Appendix to this motion.  (Mori Decl., Ex. A, App. 127-128.)

**H.      SANYO Discussed Options for Ending the PTAC Business in August 2009**

SANYO Electric and Prem Sales met again on August 29,[1] 2009 to continue discussing SANYO'S exit from the PTAC business.  (Mori Decl. ¶ 3, Ex. B, C, App. 125, 129-138.)  At this meeting, the parties discussed using another PTAC manufacturer, "Airwell," and they generally agreed that Airwell would be Prem's new manufacturer, although details were to be determined later.  *Id.*  SANYO Electric and Prem Sales also agreed to extend the existing Distribution Agreement for another year so that a large amount of inventory, which would last through Prem's transition of its business to Airwell, could be transferred to Prem Sales.  *Id.*  Prem contends that material misrepresentations were made at this meeting.  (*See, e.g.*, Compl. ¶ 39.)  SANYO obviously disputes that contention.

---

[1] Prem's Petition states that the meeting occurred on August 9, 2009, but the meeting was actually held August 29, 2009 according to the meeting minutes and the recollection of Sanyo Electric.

### I.    <u>Prem Sales and Guangdong Sanyo Enter into an Agreement for the Sale of PTAC Tooling</u>

Although SANYO had no legal obligation to assist Prem after its exit from the PTAC business, given the long relationship, SANYO attempted to end the business relationship on good terms, particularly as Prem indicated it wished to continue SANYO's PTAC business. (Yamashita Decl. ¶ 12, App. 222) After the meetings in June and August, the negotiations with Prem continued. *Id.* SANYO Electric sold its remaining inventory and tooling equipment to Prem Sales pursuant to an agreement memorialized in an e-mail between Koji Mori and Henry Patel dated October 30, 2009. (Yamashita Decl., ¶ 13, Ex. O, App. 222, 282-285.) Under this agreement, Guangdong Sanyo would sell the inventory and tooling equipment to Prem Sales for $1,062,394.65. The chain of e-mails preceding the agreement indicates that SANYO Electric gave Prem a substantial—almost 30%—discount – the actual value, acknowledged even by Mr. Patel, was $1,462,055.65. *Id.* The sale price of the tooling equipment was valued at $200,000. *Id.* As part of the agreement, Prem Sales expressly agreed that "PREM will not ask SANYO [for] ANY Compensation in the future." *Id.*

The portion of the sale agreement concerning the tooling was formalized on December 18, 2009, when Guangdong Sanyo entered into a Sale and Purchase Agreement (the "<u>Tooling Agreement</u>") with Prem Sales. (Yamashita Decl., ¶ 14, Ex. P, App. 222-223.) Before the Tooling Agreement was signed, the parties negotiated its terms. (Yamashita Decl., ¶ 15, Ex. T, U, App. 223, 327-348.) In exchange for accepting some of the terms of the draft agreement, Prem insisted on the addition of other terms, most notably the insertion of Article 11, which obligated Guangdong Sanyo to provide technical support services to Prem. *See* App. 327-348 for draft agreement upon which the Tooling Agreement was finalized. *See* Yamashita Decl., ¶ 15, Ex. R, App. 312-325. for a comparison document that shows the changes made between the draft and signed versions of the Tooling Agreement.

The Tooling Agreement's arbitration provision reads:

tk-415706

> Article 12.  *All disputes arising out of or in connection with* this Agreement *shall be finally settled in Hong Kong under the Rules of Arbitration of the International Chamber of Commerce….*

(Yamashita Decl. ¶ 14, Ex. P, App. 222-223, 286-301.)  (Emphasis added.)

### J.    Guangdong Sanyo Delivered Most of the Tooling in May 2010

Although Airwell attempted to negotiate a supply agreement with Prem, Mr. Patel did not find Airwell's offer acceptable and failed to respond to Airwell's repeated requests for comment on the agreement.  (Yamashita Decl., ¶ 17, Ex. X, App. 224, 362-364.)  Consequently, Airwell ultimately abandoned the project.  *Id.*  Prem finally made arrangements with Gree, a manufacturer chosen by Prem, not SANYO Electric, to manufacture PTACs for Prem, and the tooling was delivered to Gree.  (Yamashita Decl., ¶ 18-19, Ex. Y, App. 224, 365-368.)

In September 2010, Guangdong Sanyo discovered through Gree that seven pieces of tooling (contract value US$70) were inadvertently omitted from the May 2010 tooling shipment.  (Morito Decl., ¶ 7, Ex. 1, App. 2.)  (Yamashita Decl., ¶ 20, Ex. Z, App. 224-225, 369-370.)  SANYO Electric immediately reported this issue to Prem, requesting instructions for delivering the outstanding tooling.  *Id.*  Despite SANYO Electric's repeated attempts to obtain delivery instructions, Prem failed to respond until March 21, 2011, when Prem finally requested information regarding the undelivered tooling.  (Morito Decl., ¶ 8-9, Ex. C, App. 22.)  (Yamashita Decl., ¶ 23, Ex. CC, App. 226, 376.)

### K.    Official Termination of Distribution Agreement

On August 20, 2010, SANYO Electric and SA sent Prem Supply formal notice of their intent to terminate pursuant to Article 17 ("Term and Termination").  (Miike Decl. Ex. C, App. 85; Yamashita Decl., ¶ 27, Ex. GG, App. 227, 383.)  Accordingly, the Distribution Agreement terminated pursuant to its terms on October 19, 2010.

8

**L.**   **Prem's Allegations Against SANYO**

On December 28, 2010, Prem Sales, through its attorney Lamar Treadwell, began sending letters to SANYO Electric and SANYO Asia requesting negotiations regarding the termination of the Distribution Agreement.  (Yamashita Decl., ¶ 29, Ex. II, App. 227, 387.)    These letters alleged that SANYO owed Prem compensation related to the termination of the Distribution Agreement.  *Id.*  On March 17, 2011, Prem sent SANYO Electric and SANYO North America Corporation (with which Prem conducts a separate line of business) a letter laying out its specific claims for the first time.  (Yamashita Decl., ¶ 29, Ex. JJ, App. 227, 388-393.)  This letter also focused on the termination of the Distribution Agreement, although Prem did raise other issues, including the seven pieces of tooling that remained undelivered.  In this letter, Prem characterized this claim as a breach of the Tooling Agreement.  (Yamashita Decl., Ex. JJ, App. 391.)  The March 17 letter claimed 90 million dollars "for damages [Prem] has suffered in the past years, is suffering now, and will continue to suffer into the foreseeable future."  (Yamashita Decl., Ex. JJ, App. 393.)  This is the same amount claimed by Prem Sales in its complaint.  (Compl. ¶ 42.3.)

**M.**   **JCAA Arbitration**

SANYO Electric and SANYO Asia filed a request for arbitration with the Japan Commercial Arbitration Association against Prem Supply on June 16, 2011, fourteen days before this action was commenced.  (Declaration of Louise Stoupe in Support of Defendant's Motion for an Order to Quash Service and/or Dismiss or, in the Alternative, to Compel Arbitration and Dismiss or Stay All Claims ("Stoupe Decl."), Ex. A, App. 397-441; Dort Decl., ¶ 7, App. 141.)  This request primarily seeks a declaratory judgment that neither SANYO Electric nor SANYO Asia breached the Distribution Agreement.  *Id.*  SANYO Electric and SANYO Asia brought this request because the Distribution Agreement was the focus of Prem's previous allegations and damages claims, as noted above.  *Id.*  However, the request also touches on a number of the central issues in Prem Sales' complaint.  *Id.*

9

The arbitration currently pending in Japan will decide whether SANYO's actions at the June and August meetings were wrongful in any way toward Prem, as well as whether the transfer of the tooling to Prem Sales was in any way wrongful. (Stoupe Decl. Ex. A, Req. for Arb. ¶¶ 1.2, 1.7, 2, 2.6, 6. App. 398-400; Dort Decl., ¶ 8, App. 141.) The Japan arbitration will also decide whether SANYO's termination of the Distribution Agreement was proper. *Id.*

### N.   __Texas Complaint__

On June 30, 2011, Prem Sales commenced this suit. The complaint contains two causes of action and three substantive requests for declaratory judgment, in addition to a request for a declaratory judgment as to whether the claims are arbitrable. Plaintiff's first cause of action, for civil theft, accuses SANYO Electric of entering into a contract for the sale of the tooling while intending not to perform, and then actually failing to perform. (*See, e.g.*, Compl. ¶¶ 30, 30.2b.) Plaintiff alleges that this alleged misrepresentation and failure to perform was theft of either the money paid for the tooling or the tooling. (*See, e.g.*, Compl. ¶ 34.1.) This is the same tooling as that covered by the Tooling Agreement.

Plaintiff's second cause of action, alleged in the alternative, is for fraudulent inducement. This claim alleges that "Sanyo supplied false information to PREM in Lubbock, Texas that was material...." (Compl. ¶ 39.) The Complaint then itemizes a number of misrepresentations related to transfer of the tooling. (Compl. ¶¶ 39.1-.7.)

Finally, Prem Sales requests four declaratory judgments. The first requests a judgment regarding "[w]hether SANYO is a lawfully substituted party to the 2002 Japanese contract, or not, such that its August 20, 2009 Notice of Termination to Prem Supply, Inc., or PREM is enforceable or not." (Compl. ¶ 45.1.) This obviously is a claim related to the 2002 Distribution Agreement. The second requests a judgment regarding "[w]hether Sanyo's and Prem's course of dealing in Lubbock, Texas, with written memorandums, and payment performance by PREM constitute a contract," which

is an issue related to both the Distribution Agreement and the Tooling Agreement.  (Compl. ¶ 45.2.)

Plaintiff's third request asks "[w]hether Sanyo had the legal right to represent the Guangdong-Sanyo

entity in entering into the December 10, 2009 contract for tooling, and [w]hether such December 2009

'delivery' Guangdong-Sanyo China contract was obtained through fraud …."  (Compl. ¶ 45.3.)  This

also relates to the Distribution Agreement, and also clearly relates to the Tooling Agreement.  Finally,

Plaintiff requests a declaratory judgment regarding whether it is subject to arbitration.  (Compl. ¶

45.4.)

### O.  All SANYO Entities are Ready, Willing, and Able to Participate in Arbitration in Hong Kong and Japan

SANYO Electric and SANYO Asia have already commenced arbitration on these issues in

Japan.  Defendant SANYO Service is prepared to participate in this arbitration as well.  (Nakai Decl., ¶

13, App. 101.)

Guangdong Sanyo exited the PTAC business in 2010, and it is planning to transfer all of its

related rights and obligations to SANYO Electric, which will enable Prem to arbitrate Tooling

Agreement disputes with SANYO Electric as well.  (Morito Decl., ¶ ¶ 10-11, App. 3.)

### III.  ARGUMENT REGARDING MOTION TO COMPEL ARBITRATION

Each of Prem Sales's claims arises in connection with the Tooling Agreement, which contains

an arbitration provision that obligates Prem Sales to arbitrate this action.  Plaintiff is clearly seeking to

avoid its obligations under this provision.  Prem has crafted its complaint by bringing this action

against parties to the Distribution Agreement while asserting claims related to the Tooling Agreement

and studiously avoiding a claim for breach of contract.  The Court should see through this guise and

enforce the method of dispute resolution originally envisioned by the parties – arbitration.  This is

particularly true where, in circumstances such as the present case, Prem Sales has taken advantage of

the Distribution Agreement but now seeks to avoid its arbitration clause. In addition, each of Prem Sales' claims significantly overlaps with issues raised by a currently pending arbitration in Japan, as well as with issues that will be raised in any arbitration that will be brought under the Tooling Agreement. Accordingly, the Court should exercise its discretion to dismiss or stay this case pending resolution of these arbitrations.

### A. The Federal Arbitration Act Calls for a Mandatory Stay and the Court has Discretion to Dismiss This Action if the Court Finds That the Issues are Referable to Arbitration.

The Federal Arbitration Act provides for a mandatory stay of litigation brought "upon any issue referable to arbitration." 9 U.S.C. § 3. If the Court finds that any of the claims in this action are arbitrable, the Court must stay those claims pending arbitration. *See, e.g., Midwest Mechanical Contractors, Inc. v. Commonwealth Constr. Co.*, 801 F.2d 748, 751 (5th Cir. 1986) ("If the issues in a case are within the reach of the agreement, the district court has no discretion under section 3 to deny the stay."), *cited by Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 396 (5th Cir. 2006). If all of the claims in this action are arbitrable, "[t]he weight of authority clearly supports dismissal of the case." *See Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) (dismissing with prejudice).

Under 9 U.S.C. § 3, even if one or more defendants are not themselves entitled to arbitrate the claims in this action, e.g., because they are nonsignatories, they are nevertheless entitled to a mandatory stay so long as "the determination of factual and legal issues related to the claims brought against the nonsignatories [to an arbitration agreement] would be the subject of an arbitration proceeding between signatories." *See Hill v. GE Power Sys. Inc.*, 282 F.3d 343, 347 (5th Cir. 2002); *Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A.*, 372 F.3d 339, 342 (5th Cir. 2004); *see also Midwest Mechanical Contractors, Inc.*, 801 F.2d at 750 ("there is no specific requirement that arbitration actually be pending before a stay of litigation can be granted"). Section 3 of the FAA applies both to nonsignatories seeking a stay against a signatory *and* to signatories seeking a stay

12

against a nonsignatory pending the outcome of an arbitration that the signatories are already engaged in *Waste Mgmt., Inc.*, 372 F.3d 339 (nonsignatory) (emphasis added); *Med-IM Dev., Inc. v. GE Capital Corp.*, No. H-07-1618, 2008 U.S. Dist. LEXIS 25635 (S.D. Tex. Mar. 31, 2008) (applying Section 3 to a signatory but ultimately granting a discretionary stay); *see also In re Devon Energy Corp.*, 332 S.W.3d 543, 549 (Tex. App. 2009) ("[A] signatory's right to meaningful arbitration should be prioritized over the potential harm to a non-signatory's interests.... Our focus concerns the preservation of meaningful arbitration, not the potential harm to the interests of a nonsignatory." quoting *Waste Mgmt., Inc.*, 372 F.3d at 343).

Pursuant to 9 U.S.C. § 3, nonparties to an arbitration or nonsignatories to an arbitration agreement are nevertheless entitled to a mandatory stay pending the outcome of arbitration if 1) the arbitrated and litigated disputes involve the "same operative facts"; 2) the claims asserted in the arbitration and litigation are "inherently inseparable"; or 3) the litigation will have a "critical impact" on the arbitration. *Waste Mgmt., Inc.*, 372 F.3d at 342. Any of these three factors may independently warrant a mandatory stay. *See id.* at 343 n. 6 ("The factors formulated above recur in the relevant precedential language but they are neither required (in that articulation) nor exhaustive.").

Finally, even if a party is not entitled to a mandatory stay under § 3, this Court may grant a discretionary stay pursuant to its inherent authority to control its own docket. *See Med-IM Dev.*, 2008 U.S. Dist. LEXIS 25635, at *22 (citing *Hornbeck Offshore (1984) Corp. v. Coastal Carriers Corp.*, 981 F.2d 752, 755 (5th Cir. 1993)). Courts grant discretionary stays of nonarbitrable claims when the nonarbitrable claims "significantly overlap" with arbitrable claims. *See Med-IM Dev.*, 2008 U.S. Dist. LEXIS 25635, at *27-28. Courts also grant discretionary stays where the litigation is not likely to have a "critical impact" on a related arbitration, but is likely to have some lesser impact. *See id.* at *38-31.

13

**B.      Each Claim in this Matter is Referable to Arbitration Because the Tooling Agreement Contains a Broad Arbitration Clause and Because Prem Sales is Equitably Estopped from Avoiding That Arbitration Clause.**

This Court should compel Prem Sales to arbitrate each of its claims because (1) "the dispute in question falls within the scope of [the Tooling Agreement's] arbitration agreement" and (2) "there is a valid agreement to arbitrate" that applies to Prem Sales and each defendant in this action. *See Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 396 (5th Cir. 2006).

**1.      The Tooling Agreement contains a broad arbitration provision that covers each claim in this dispute.**

The Tooling Agreement contains a broad arbitration provision that covers each claim in this action. "The dispute in question [therefore] falls within the scope of [the] arbitration agreement." There is a strong federal policy in favor of arbitration, and broad agreements to arbitrate, such as the clause found in the Tooling Agreement, are routinely enforced by Texas district courts. *See, e.g., Safer v. Nelson Fin. Grp.*, 422 F.3d 289, 294 (5th Cir. 2005). "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration ...." *Harvey v. Joyce*, 199 F.3d 790, 793 (5th Cir. 2000) (quotations omitted).

The Fifth Circuit "distinguishes between broad and narrow arbitration clauses. *If the clause is broad, the action should be stayed and the arbitrators permitted to decide whether the dispute falls within the clause*.... [A]rbitration clauses containing [the phrase] 'any dispute' ... are of the broad type." *Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 754 (5th Cir. 1993) (emphasis added). The language "in connection with" also indicates that an arbitration clause is broad. *See Pennzoil Exploration & Prod. Co. v. Ramco Energy*, 139 F.3d 1061, 1067 (5th Cir. 1998).

The arbitration provision in the Tooling Agreement reads:

> *All disputes* arising out of or *in connection with* this Agreement shall be finally settled in Hong Kong under the Rules of Arbitration of the International Chamber of Commerce ...(emphasis added).

14

tk-415706

(Yamashita Decl. Ex. P, App. 293-294.)

The Tooling Agreement therefore contains a broad arbitration clause.  When an arbitration clause is broad, the clause "reach[es] all aspects of the relationship."  *See Pennzoil Exploration & Prod. Co.*, 139 F.3d at 1067 (quotations omitted).  Broad arbitration clauses cover both breach of contract *and* tort claims, so long as "the dispute 'touch[es]' matters covered by the" relevant agreement *Id.* at 1068 (emphasis added); *SDB Trade Int'l, L.P. v. E&E Grp, LLC*, No. H-08-226, 2008 U.S. Dist. LEXIS 101302, at *16 (S.D. Tex. May 15, 2008).  Broad arbitration clauses also cover claims under separate, but related, contracts, even if those related contracts do not contain arbitration clauses.  *Id.* (compelling arbitration of claims under letter agreements not containing arbitration clauses because the letter agreements and claims arising under them "relate[d] to" an agreement containing an arbitration clause).

*SDB Trade Int'l, L.P.* is a case precisely like the one at bar.  The arbitration clause in that case provided:  "Any and all DISPUTES arising out of this Contract shall be attempted in good faith to be settled amicably between or amongst the PARTIES.  Should such DISPUTE(S) not be able to be resolved . . . then the DISPUTE(s) arising out of or in connection with the present AGREEMENT, including any question regarding its existence, validity or termination, or breach or alleged breach thereof, shall be submitted . . . to a triumvirate of qualified Arbitrators ...."  2008 U.S. Dist. LEXIS 101302, at *16 (S.D. Tex. May 15, 2008).  The plaintiff in that case alleged that the defendant "induced it into advancing funds by making false representations that [the defendant] would apply the funds toward the purchase price."  *Id.* at *18.  The plaintiff brought suit "alleging state law causes of action for, *inter alia*, fraud and unjust enrichment."

Reasoning that the claims could not be maintained "without reference to the Agreement," the court held that the arbitration clause at issue covered the plaintiff's tort claims.  *Id.* at *17-18 (citing

*Downer v. Siegel*, 489 F.3d 623, 627 (5th Cir. 2007)).  As in SDB, Prem alleges that it was induced into paying funds to SANYO and entering into the Tooling Agreement by representations that SANYO would then provide tooling suitable for Prem's purposes.  Prem cannot make these claims without referencing the Tooling Agreement, which is the written agreement providing for the sale of all of the tooling at issue.  Prem's claims therefore fall within the scope of the arbitration provision.

### 2.   The "Lubbock contract" arises out of or in connection with the Tooling Agreement.

*Pennzoil Exploration & Prod. Co.* involved a number of agreements, some of which contained arbitration provisions, others of which did not.  139 F.3d at 1062.  All of the agreements related to the development of a particular oil field.  *Id.* at 1062-64.  Plaintiff's claims were based on its rights under one of the letter agreements, the June 7, 1993 letter agreement.  *Id.* at 1067.  This agreement did not contain an arbitration provision.  Nevertheless, the court held, "The fact that Ramco's claim is based on the June 7 letter agreement does not decide whether the dispute is arbitrable under the JOA's arbitration provision....  Pursuant to the JOA's arbitration clause, 'any' dispute arising out of 'or in relation to' or 'in connection with' the JOA shall be settled by arbitration.  Therefore, it is not necessary that the dispute arise out of the JOA to be arbitrable ..." *Id.* at 1067-68.  The court held that because the JOA (containing the arbitration provision) and the letter agreement (under which the claims were brought) were "related to the same overriding goal," development of the oil field, disputes under the letter agreement were "in connection with" the JOA.  *Id.* at 1068.

Similarly, Prem alleges the existence of a "Lubbock contract" that it claims governs, at least in part, the sale of the tooling.  (Compl. ¶ 18.3.)  If there is in fact a "Lubbock contract," it shares the same overriding goal as the Tooling Agreement – the sale of the tooling to Prem.

Because all of Prem's claims fall within the scope of the Tooling Agreement's broad arbitration provision,[2] each claim should be referred to arbitration and this case dismissed or stayed.

### 3. Prem Sales is a party to the Tooling Agreement and should be equitably estopped from avoiding its broad arbitration provision because each claim relies on the terms of the Tooling Agreement.

The SANYO Defendants are not signatories to the Tooling Agreement.  However, Prem Sales is a signatory, and it should not be permitted to maneuver out of its obligation to arbitrate disputes arising in connection with the Tooling Agreement.  SANYO may enforce the Tooling Agreement's arbitration provision if either (a) Plaintiff's claims rely on the terms of the Tooling Agreement *or* (b) Plaintiff alleges interconnected and concerted misconduct between the nonsignatories and a signatory to the arbitration provision.  *See Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 398 (5th Cir. 2006) (citing *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 526-27 (5th Cir. 2000)).

The first of these tests is plainly met.  As the Fifth Circuit has noted, a stay under these circumstances "makes sense because the parties resisting arbitration had *expressly agreed to arbitrate claims of the very type that they asserted against the nonsignatory.*" *Id.* (Quotations omitted) (emphasis added).

In *Jureczki v. Bank One Tex, N.A.*, the plaintiffs sued a signatory bank and three nonsignatories for *fraud*, conspiracy, negligent and *fraudulent misrepresentation*, breach of contract, and *conversion*, all under Texas state law 75 F. App'x 272, 273 (5th Cir. Sep. 15, 2003) (emphasis added).  They argued "that they are not asserting claims under the contract and are instead relying on state tort law claims to recover from Defendants." *Id.* at 275.  The court rejected this argument and compelled arbitration of all the claims with respect to the nonsignatories to the arbitration provision.  The court held that all of the claims were all based on the wrongful withdrawal of the plaintiff's funds, which

---

[2] Prem Sales' first request for a declaratory judgment can be made by referring only to the Distribution Agreement. Accordingly, this request should be stayed pending resolution of the Japan arbitration, as discussed below.

was governed by bank account rules containing an arbitration provision. *Id.* The court stated, "The Jureczkis cannot cast their claims in tort rather than under the contract governing their account merely to avoid arbitration." *Id.*

In this case, Prem similarly brings causes of action for theft and fraudulent conduct. Both causes of action rely on SANYO's alleged misrepresentation regarding its intent to perform the Tooling Agreement and its alleged subsequent failure to deliver the tooling in adequate condition. Neither of these claims is viable if SANYO's obligations under the Tooling Agreement were in fact satisfactorily performed. Because Prem relies on the terms of the Tooling Agreement in asserting its claims, it should be bound by that agreement's arbitration provision. *See also Salad Bowl Franchise Corp. v. Crane*, No. 3:11-CV-0043-D, 2011 U.S. Dist. LEXIS 27406, at *17 (N.D. Tex. Mar 17, 2011) (allowing nonsignatories to compel arbitration against a signatory because "[t]he ... fraud claim ... (predicated on Salad Bowl's allegedly intentional efforts to deprive defendants of benefits promised) [is] based on false representations made during the course of negotiating and performing the terms of the Agreement."); *Dr. Pepper Bottling Co. of Tex., Inc. v. Presidential Life Ins. Co.*, No. 3-01-CV-2168-R, 2002 U.S. Dist. LEXIS 4196, at *14 (N.D. Tex. Mar. 11, 2002) (compelling arbitration with respect to a claim of fraudulent inducement because "[i]n order to prove that [defendants] misrepresented that the" contract at issue would be performed, "plaintiff must rely on the terms of the insurance contract").

Because each of Prem's claims relies on the terms of the Tooling Agreement, this Court should compel Prem to arbitrate all of the claims pursuant to the terms of that Agreement and dismiss this action.

18

**4. Plaintiff is bound by the Tooling Agreement's arbitration provision because Plaintiff alleges substantially interconnected and concerted misconduct between SANYO and Guangdong Sanyo, a party to the Tooling Agreement.**

Even if Plaintiff's claims do not rely on the terms of the Tooling Agreement, SANYO may nevertheless enforce the Tooling Agreement's arbitration provision because Plaintiff lodges the same allegations against Guangdong Sanyo that it lodges against SANYO. *See Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 528 (5th Cir. 2000); *Brown v. Pac. Life Ins. Co.*, 462 F.3d 389 (5th Cir. 2006). As the Fifth Circuit in *Grigson* noted, allowing Plaintiff to avoid an arbitration provision "would be especially inequitable where, as here, a signatory non-defendant is charged with interdependent and concerted misconduct with a non-signatory defendant." *Grigson*, 210 F.3d at 528.

In this case, both of Plaintiff's causes of action depend *completely* upon allegedly wrongful acts committed by Guangdong Sanyo. Prem acknowledges that Guangdong Sanyo was the owner of the tooling and is the owner of any undelivered tooling. (Compl. ¶ 39.1 ) Guangdong Sanyo is of course also the signatory to the agreement requiring delivery of the tooling to Prem Sales in a condition usable for normal operation. (Yamashita Decl. ¶ 14, Ex. P, 222) If the Defendants in this case acted wrongfully as alleged by Prem, *Guangdong Sanyo also necessarily acted wrongfully by breaching the Tooling Agreement*. Indeed, Prem clearly alleges: "SEAC and SAMS and Guangdong-Sanyo have ratified or by waiver adopted the acts of Sanyo, as its agent, as their own." (Compl. ¶ 27.) Prem could not more clearly have asserted "interdependent and concerted" misconduct by the Defendants *and* Guangdong Sanyo.[3]

---

[3] In addition, both arbitration rules and Chinese law permit SANYO Electric and SANYO Asia to join an arbitration pursuant to the Tooling Agreement even though they are not parties to it. The Rules of Arbitration of the International Chamber of Commerce, which govern the arbitration clause of the Tooling Agreement, indicate that a claimant may join non-signatories if said non-signatories should be included within the scope of the arbitration. (Dort Decl. ¶ 9, Ex. H, App. 178). Furthermore, Chinese law, which governs the Tooling Agreement, will respect an ICC determination to join non-signatories. (Declaration of Xiaohu Ma in Support of Defendant's Motion for an Order to Quash Service and/or Dismiss or, in the Alternative, to Compel Arbitration and Dismiss or Stay All Claims, ¶ 4-5, App. 24.)

tk-415706

Because Plaintiff alleges interdependent and concerted misconduct by both the Defendants and a signatory to the Tooling Agreement, Guangdong Sanyo, Plaintiff should be compelled to arbitrate all of its claims.  Because all of the claims are referable to arbitration, the Court should dismiss this action.

> **5.      Plaintiff's allegations that the Tooling Agreement is invalid are for an arbitrator to decide because Plaintiff does not allege the arbitration provision in particular was a result of fraud or misrepresentation.**

Plaintiff alleges throughout the complaint that the Tooling Agreement was obtained through fraud or coercion. (*See, e.g.*, Compl. ¶ 45.3a.)  However, this does not permit Prem Sales to avoid the arbitration provision contained in the Tooling Agreement.  The Supreme Court has squarely held that "[t]he statutory language [of the FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006).  That is, if a party seeking to avoid arbitration alleges that the entire contract is somehow invalid, the question of validity is a question for the arbitrator, not the courts.  Courts may only consider an attack on the arbitration provision itself as distinct from the contract as a whole. *See Brown*, 462 F.3d at 396-397 (when plaintiff "contend[ed] that their consent to arbitrate was vitiated by fraud and error," the court noted that "a challenge to the validity [of a contract] as a whole, and not specifically to the arbitration clause, must go to the arbitrator") (quoting *Buckeye Check Cashing*, 546 U.S. at 448).  Because invalidity of a contract as a whole is a question for the arbitrator, this Court should compel arbitration of all of Prem's claims.

20

C.   **SANYO Electric and SANYO Asia Have Initiated Arbitration Before the JCAA, Guangdong Sanyo and/or Its Transferees are Entitled to Arbitration Before the International Chamber of Commerce, and the Court Should Stay This Litigation Pending the Outcome of Those Arbitrations.**

Even if the Defendants may not compel Prem Sales to arbitrate its claims against them, the Defendants are nevertheless entitled to a mandatory stay of this action under 9 U.S.C. § 3 pending the outcome of arbitrations in Japan and Hong Kong.

1.   **SANYO is entitled to a mandatory stay because the claims in this action and in related arbitrations involve the same operative facts and are inherently inseparable and because this action is likely to have a critical impact on the arbitrations.**

The Defendants are entitled to a mandatory stay of this action pending the Japan arbitration and the potential Hong Kong arbitration because (1) the litigation and arbitrations involve or will involve the same operative facts; (2) the claims asserted in the arbitrations and litigation are or will be "inherently inseparable"; and (3) the litigation is likely to have a "critical impact" on both arbitrations. *Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A.*, 372 F.3d 339, 342 (5th Cir. 2004).

In *Waste Management*, the plaintiff, opposing a motion to stay, argued that the operative facts underpinning an equitable claim are different from the operative facts underpinning a breach of contract claim. *Id.* at 343. The plaintiff also argued that the operative facts were not identical because none of affirmative defenses in the arbitration would be relevant in the litigation. *Id.* The court rejected these arguments. The court reasoned that regardless of the claims or defenses asserted, the details of the agreement at issue, its negotiation, and the general circumstances surrounding the disputed draw on the guarantee at issue would be relevant to both proceedings. *Id.* at 345.

The same operative facts are similarly at issue in both this litigation and the Japan arbitration. As described above, Prem's claims involve alleged misrepresentations made at meetings between Prem Sales and SANYO Electric in June and August 2009. (Compl. ¶¶ 30, 39.) They also center on obligations governed by the Tooling Agreement – most importantly, the obligation to deliver the

21

tooling. (Compl. ¶¶ 30.3, 41.)  SANYO's request for arbitration requests a determination of these very same issues. (Stoupe Decl., Ex. A, Req. for Arb. ¶¶ 1, 2, 2.6., App. 398-399)

The issues presented in this litigation will also arise in any Hong Kong arbitration.  All of Prem Sales' claims turn on whether the tooling was actually delivered as required by the Tooling Agreement. This issue will be the crux of any arbitration in Hong Kong.  The same operative facts – regarding whether misrepresentations were made regarding the tooling, whether the tooling was delivered, and whether the tooling was in satisfactory condition upon delivery – will necessarily be at issue in both this litigation and the Japan and Hong Kong arbitrations.  This litigation should therefore be stayed pending the outcome of the arbitrations.

In *Waste Management*, the plaintiff asserted that the claims in the arbitration and litigation were not "inherently inseparable" because equitable claims involve different legal elements from claims for breach of contract.  372 F.3d at 343-44.  However, the court rejected the plaintiff's argument, reasoning that because the claims in both proceedings sought recovery of the same payment, the claims were "inherently inseparable" despite being based on different legal theories.  *Id.* at 345. Similarly, this litigation, the Japan arbitration, and the Hong Kong arbitration will each necessarily result in an order either awarding or denying the same payment – the amount that Prem Sales has been damaged by the alleged non-delivery of the tooling. (Stoupe Decl., Ex. A, Req. for Arb. ¶ 2.6 (addressing liability for *actions regarding transfer of the tooling*.), App. 398.

Finally, the plaintiff argued that the litigation in *Waste Management* would not have had a "critical impact" on the arbitration because the proceedings involved sufficiently different issues so that "the arbitrator's fact-finding and legal rulings would not be obviated." 372 F.3d at 344.  Again, the court rejected the plaintiff's argument, reasoning that allowing the litigation to proceed would have "risk[ed] inconsistent results." *Id.* at 345.

22

Similarly, proceeding with this action would have a critical impact on Guangdong Sanyo's or its transferee's right to arbitration. A ruling that the Defendants in fact did not deliver the tooling in a condition "usable for normal operation" – which is required for Prem Sales to succeed – would *necessarily* mean that Guangdong Sanyo breached the Tooling Agreement. Allowing a jury to decide this issue while an arbitrator prepares to decide whether the Tooling Agreement was adequately performed by Guangdong Sanyo would risk inconsistent results. In addition, because the arbitration clause is broad enough to cover tort claims, the arbitrator in any Hong Kong arbitration will likely be hearing *these exact causes of action* in addition to any breach of contract claims that are asserted.

The currently pending Japan arbitration will address the question of whether the Defendants "performed all of their contractual *and related* obligations with respect to all agreements arising out of or in relation to or in connection with the PSA" (including the Tooling Agreement), as well as whether "Claimants committed [any] other violations of law with respect to their exit from the PTAC business and proposed transfer of the tooling to Prem Sales Limited." If this litigation goes forward, it will determine these exact issues, and any judgment in this litigation is therefore likely to "strongly influence" the arbitrator, depriving Defendants of their right to arbitrate all disputes arising "out of or in relation to or in connection with" the Distribution Agreement. *Id.*

> **2.  This Court should grant a discretionary stay even if no mandatory stay is warranted because the claims significantly overlap with claims raised in arbitration and this action will have some impact on the arbitrations.**

Even if the defendants cannot meet any of the tests for granting a mandatory stay, those same factors weigh in favor of granting a discretionary stay. *See. e.g.*, *Med-IM Dev., Inc. v. GE Capital Corp.*, No. H-07-1618, 2008 U.S. Dist. LEXIS 25635, at *25-28 (S.D. Tex. Mar. 31, 2008) (holding that although claims were not based on same operative facts or inherently inseparable, a discretionary stay was nevertheless warranted because "much of the same evidence developed in the arbitration"

23

would similarly be at issue in the litigation). That is, if the claims "overlap," or if the litigation will have some "impact" on the arbitration, this court should award a stay pursuant to its inherent authority to control its docket.

As described above, this litigation, if permitted to proceed, will try the same issues that will be raised in the Hong Kong arbitration. Much of the evidence developed in the arbitration will also be applicable in this litigation. Similarly, the arbitration currently pending in Japan will address whether SANYO acted wrongfully when discussing the transfer of the tooling to Prem, and whether SANYO breached any agreement related to the Distribution Agreement, including the Tooling Agreement. Plaintiff's claims overlap with the claims that have been or will be presented in these related arbitrations.

Due to the extensive overlap between the proceedings, the impact this litigation (if allowed to proceed) would have on the Hong Kong and Japan arbitrations similarly warrants a discretionary stay of the litigation. As in *Med-IM*, any rulings made in this litigation "could impact [Guangdong Sanyo's and the Defendants'] ability to have the arbitrator decide whether the misrepresentations occurred as alleged." *Id.* at *29. In exercising control over its own docket, this court should stay this litigation pending the outcome of the related arbitral proceedings.

## IV.     CONCLUSION

For the reasons set forth above, SA respectfully moves this Court to quash service and/or dismiss the complaint.

In the alternative, SA moves to

(a)  compel Prem Sales to arbitrate each of its claims and to dismiss or stay this action;

(b)  stay this action pursuant to 9 U.S.C. § 3; or

(c)  stay this action pursuant to the Court's inherent authority to manage its docket.

24

Dated: _August 8, 2011_          **JOHN C. SIMS**
                                 **ATTORNEY-AT-LAW**

                                 John C. Sims
                                 Texas Bar No. 18426000
                                 Law Office of John C. Sims
                                 P.O. Box 10236
                                 Lubbock, Texas 79408
                                 TEL (806) 763-9555
                                 FAX (806) 763-5804

                                 **Counsel for Defendants**
                                 SANYO ELECTRIC AIR CONDITIONING CO.,
                                 LTD.;
                                 And
                                 SANYO AIR CONDITIONERS
                                 MANUFACTURING, SINGAPORE, PTE., LTD.;
                                 And
                                 SANYO ELECTRIC CO., LTD.

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that on August 3, 2011, he has conferred with Lamar Treadwell, counsel for Plaintiff herein, and he opposes the relief requested in this Motion.

_____
                                 John C. Sims

## CERTIFICATE OF SERVICE

The undersigned certifies that on this _8_ day of _Aug_, 2011, a true and correct copy of the foregoing document was filed via CM/ECF which will send electronic notification to the following attorneys of record:

_____
                                 John C. Sims

Lamar D. Treadwell
551 West Cordova Rd. #720
Santa Fe, New Mexico 87505
USA
T: 1-505-660-0602
F: 1-505- 424-0058
allatron@mindspring.com
**Attorney for Plaintiffs**

25

tk-415706