# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

PREM SALES, LTD.

           Plaintiff,

   v.

SANYO ELECTRIC AIR CONDITIONING CO.,
LTD.;
And
SANYO AIR CONDITIONERS
MANUFACTURING, SINGAPORE, PTE.,
LTD.;
And
SANYO ELECTRIC CO., LTD.;
And
BUSINESS ENTITY DOES 1-10;

           Defendants.

Civil Action No. 5:11-CV-136-C

### DECLARATION OF KATSUMI MORITO
### IN SUPPORT OF DEFENDANT'S MOTION FOR AN ORDER TO QUASH SERVICE
### AND/OR DISMISS OR, IN THE ALTERNATIVE,
### TO COMPEL ARBITRATION AND DISMISS OR STAY ALL CLAIMS

I, KATSUMI MORITO, declare as follows:

1.     I am a managing director of Guangdong Sanyo Air Conditioner Co., Ltd. ("Guangdong Sanyo") and am Chairman of the Board of Directors. I have personal knowledge, or knowledge by virtue of my position as Chairman of the Board of Directors of Guangdong Sanyo since July 2009, of the following facts, and I am authorized to make this declaration on behalf of Guangdong Sanyo.

2.     Guangdong Sanyo is a Chinese entity incorporated under the laws of the People's Republic of China and headquartered in Guangdong, China. It does not have any employees or operations in the United States.

3.     At all relevant times, Guangdong Sanyo has been a wholly-owned subsidiary, directly or indirectly, of SANYO Electric Co., Ltd. ("SANYO Electric").

tk-418923

1

4.      Guangdong Sanyo was involved in the manufacture of Packaged Air Conditioner Terminals ("PTACs") until 2009.  Some of the PTAC units that we manufactured were supplied to Plaintiff Prem Sales, Ltd. ("Prem Sales").  PTACs are self-contained air conditioning units that are used primarily in hotels and restaurants.

5.      On December 18, 2009, as Guangdong Sanyo was planning to exit the PTAC manufacturing industry, it entered into a Sale and Purchase Agreement ("Tooling Agreement") with Prem Sales.  The Tooling Agreement was negotiated by SANYO Electric on Guangdong Sanyo's behalf.  Under the Tooling Agreement, Guangdong Sanyo agreed to sell its fan equipment and tooling to Prem.  Attached marked Exhibit A is a true and accurate copy of the Tooling Agreement.

6.      After the signing of the Tooling Agreement, I understand there were various discussions between SANYO Electric and Mr. Patel regarding where to deliver the tooling. After we were informed where to send the tooling in April 2010, the vast majority of the tooling was delivered by Guangdong Sanyo to Gree (Prem Sales' chosen manufacturer) in or around May 2010.

7.      In September 2010, Guangdong Sanyo was informed by Gree that seven pieces of tooling were inadvertently omitted from the May 2010 tooling shipment.  The seven missing items were:

| Parts Code | Description | Contract Price |
|---|---|---|
| 851 2 4139 185 00 1 | Tube Sheet Evap R | US$10 |
| 851 2 4139 185 00 1 | Tube Sheet Evap R | US$10 |
| 851 2 4142 207 00 2 | Tube Sheet Cond R | US$10 |
| 851 2 4142 207 00 2 | Tube Sheet Cond R | US$10 |
| 851 2 4143 210 00 2 | Tube Sheet Cond L | US$10 |
| 851 2 4143 210 00 2 | Tube Sheet Cond L | US$10 |
| 851 2 4140 193 00 1 | Tube Sheet Evap L | US$10 |

8.      Guangdong Sanyo immediately informed Mr. Yamashita of SANYO Electric that the seven pieces remained undelivered, and it is my understanding that he then contacted Mr. Patel of Prem by e-mail on September 21, 2010 to ask where to deliver the seven remaining tools. To the best of my knowledge, Mr. Yamashita did not receive a response.

9.      In addition, I emailed Mr. Patel myself twice in February 2011, but received no response from Mr. Patel. Mr. Patel remained silent on the issue until March 21, 2011, when he requested information regarding the undelivered tooling. Attached marked Exhibit B is a true and accurate copy of the two emails that I sent to Mr. Patel in February 2011 and attached marked Exhibit C is a true and accurate copy of Mr. Patel's response.

10.     Guangdong Sanyo fully exited the PTAC business in 2010. Other than this potential dispute with Prem, it has no outstanding matters related to the PTAC business.

11.     Guangdong Sanyo is currently planning to transfer its rights and obligations in the Tooling Agreement to SANYO Electric, who is willing to arbitrate in Hong Kong as a transferee.

12.     Guangdong Sanyo supports Defendant SANYO Asia Pte., Ltd.'s Motion to Dismiss or Stay All Claims filed on August 8, 2011.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of August, 2011, in Guangdong, China.

_____
KATSUMI MORITO

Exhibit 1A

## SALE AND PURCHASE AGREEMENT

This Agreement is made and entered into this day of December 18, 2009 by and between;

Guangdong Sanyo Air Conditioner Co., Ltd., a corporation established and existing under the laws of China, having its principal place of business at 9-11 Bi Tang West 2nd Street, Jiang Wan 1st Road, Foshan, Guangding China (hereinafter referred to as "Seller"), and

Prem Sales Limited, a corporation established and existing under the laws of State of Texas,

having its principle place of business at 6021 Avenue A, Lubbock, Texas 79404 United

States of America (hereinafter referred to as "Buyer").

Seller and Buyer may hereinafter collectively be referred to as the "Parties" and individually

as a "Party".

WHEREAS:

A.  Seller is a manufacturer and exporter of various types of air conditioners, and also is an

owner of the Equipment as defined hereinafter;

B.  Buyer is a distributor and importer of various types of air conditioners; and

C.  Seller wishes to sell the Equipment to Buyer and Buyer wishes to purchase the

1

Equipment from Seller.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, the Parties hereby agree as follow:

ARTICLE 1   EQUIPMENT

"Equipment" means equipment and tooling for manufacturing air conditioners, the details of which are described in Annex 1 of this Agreement.

ARTICLE 2   SALE AND PURCHASE

2.1   Upon the terms and conditions set forth herein, Seller agrees to sell to Buyer the Equipment, and Buyer agrees to purchase the Equipment from Seller.

2.2   Seller shall, at its own expense, contract for the carriage of the Equipment to the following places designated by Buyer; provided, however, that if the Parties agree in writing, Seller shall not be obliged to transfer one or more items of the Equipment (hereinafter referred to as the "Left Items") to the following places by contracting for

2

5



the carriage and may leave such Left Items at their current locations.

(i)      Tooling (specified in Annex 1)

      Name of Recipient : AIRWELL Air Conditioning (China) Co Ltd

      Address : 2 Wuhe Avenue South, Bantian Longgong Shanzhen China

(ii)     Fans (specified in Annex 1)

      Name of Recipient : Guangdong Sunwill Precising Plastic Co., Ltd

      Address : No.6 Keyuan No.1 Road Shunde High&New Technological

      Industrial Park (Ronggui) Foshan Guangdong China

**ARTICLE 3    PRICE**

The Parties agree that the sale and purchase price of the Equipment is Forty Thousand US

Dollars (40,000 USD) (hereinafter referred to as "Price").

**ARTICLE 4    DELIVERY**

4.1     Within twenty-one (21) days from the payment of the Price by Buyer pursuant to

      Article 7, Seller shall deliver the Equipment except the Left Items, if any, to Buyer at

      Seller's Premise in Guangdong, China (hereinafter referred to as the "Seller's

8

6

Premise") by loading the Equipment except the Left Items, if any, to the container of the carrier which Seller has contracted with pursuant to the provision of Article 2. 2 at the Seller's Premise. The day when Seller loads the Equipment to the container of the carrier shall be specified and notified by Seller to Buyer in advance in writing, and such day shall be referred to as the "Delivery Date" hereinafter. Left Items shall be deemed to be delivered to Buyer at their current locations on the Delivery Date as well.

4.2     Seller shall be responsible for loading of the Equipment except the Left Items, if any.

4.3     Immediately after the loading of the Equipment except the Left Items, if any,, Seller shall send transport documents to Buyer or the third party(ies) designated by Buyer to enable Buyer or such third party(ies) to claim the Equipment from the carrier.

4.4     Buyer shall be responsible for unloading the Equipment except the Left Items, if any.

**ARTICLE 5     TRANSFER OF RISKS**

Risks of the Equipment shall be transferred from Seller to Buyer on the Delivery Date.

4

7



ARTICLE 6     WARRANTIES

6.1     Seller only represents that (i) up to the Delivery Date the Seller is the sole owner and has legal title, full power and authority to sell, assign and transfer the Equipment to the Buyer and that (ii) up to the Delivery Date the Equipment is still usable for normal operation.

6.2     Seller shall sell and transfer the Equipment on an as is basis and shall not guarantee or warrant on Equipment in any cases unless otherwise expressly set forth herein. Any loss or damage that may be directly or indirectly caused by or occurs to the Equipment on and after the Delivery Date shall be borne and be the responsibility of Buyer.

ARTICLE 7     PAYMENT

Payment of the Price shall be made in US$ into the bank account designated by Seller within five (5) days from the effective date of this Agreement provided in Article 14.1.

5

8

**ARTICLE 8**      TRANSFER OF OWNERSHIP

The ownership of the Equipment shall be transferred from Seller to Buyer on the Delivery Date.

**ARTICLE 9**      DOCUMENTATIONS

Seller shall send the original specifications and/or drawings of the Equipment to the address designated by Buyer.

**ARTICLE 10**      INDEMNITY

Buyer shall indemnify, defend and hold harmless Seller from and against any and all taxes, claims, demands, losses, costs, expenses, obligations, liabilities, action, damages and deficiencies whatsoever   (and of any kind together with any interest and penalties thereto, incurred or suffered by Seller, )  incurred by or resulting from the transaction under this Agreement and the Equipment on and after the Delivery Date.

**ARTICLE 11**      SUPERVISE

6

9



11.1 Upon Buyer's written request, Seller shall provide Buyer technical support (hereinafter

referred to as the "Supervise") regarding the operation of the Equipment to the extent

that Seller deems necessary. The contents of the Supervise shall include and be

limited to the followings;

a) Moisture control

b) Vacuum level control

c) Nitrogen blow

d) Refrigerant charging amount control

e) Sampling test

f) Safety inspection

( Dialectric voltage withstand inspection )

g) Structure inspection

h) Inspection for printing materials

i) Packing condition inspection

j) UL certified parts inspection

11.2 The Supervise shall be provided to Buyer by Seller free of charge at the place agreed

by and between the Parties from when the Equipment starts operating and becomes

ready for the Supervise till March 31, 2010 under the conditions that Buyer's

obligations stipulated Article 11.3 are fulfilled and that the employees of Seller who

possess the skill necessary for the Supervise remain employed by Seller. Should

Seller fail to implement whole or any part of its obligations stipulated in Article 11.1 due

to lack of one or more of the said conditions, Seller shall not be responsible for

7

10



implementing such obligations and paying any compensation to Buyer. In addition,

notwithstanding the foregoing, Seller shall not guarantee that the Equipment will start

operating and become ready for the Supervise before March 31, 2010.

11.3 Buyer shall fully cooperate with Seller and shall provide all reasonable assistance and

necessary information and data to Seller in the course of execution of the Supervise.

In case the Supervise shall be executed at the premise of the third party, Buyer shall

be responsible for gaining consent of such third party in advance to have Seller

execute the Supervise at such premise.

11.4 Seller shall not be responsible for any damages or losses or whatsoever nature    .

including without limitation, consequential or indirect damages or losses incurred by

Buyer and/or any other third party in connection with or resulting from Seller's

commission or omission regarding the Supervise.

ARTICLE 12      ARBITRATION

11



All disputes arising out of or in connection with this Agreement shall be finally settled in Hong Kong under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules.

ARTICLE 13    ENTIRE AGREEMENT

All previous documents undertakings and agreements, whether agreements, whether verbal, written or otherwise, between the Parties concerning the subject matter of this Agreement are cancelled and shall not affect or modify any of the terms and obligations set forth in this Agreement, except as the same may be made part of this Agreement in accordance with the terms of this Agreement.

ARTICLE 14    TERMINATION AND DEFAULTS PROVISIONS

14.1    The Parties agree that this Agreement shall be effective from December 18, 2009 .

14.2    Either Party (hereinafter referred to as the "Non-breaching Party") may, at its option, terminate this Agreement upon default by the other Party (hereinafter

9

12



referred to as the "Breaching Party") if such default has not been cured within fifteen (15) days after receipt of a written notice specifying such default by the Non-breaching Party.

14.3    The Non-breaching Party, whether chooses to terminate this Agreement pursuant to the Article 14.2 or not, shall be entitled to recover from the Breaching Party any and all damages, losses, expenses or costs incurred as a result of the default of the Breaching Party; provided, however, that the total amount of liability of the Breaching Party shall not exceed the Price.

**ARTICLE 15    GOVERNING LAW**

This Agreement is governed by and construed in accordance with the laws of China.

IN WITNESS WHEREOF, this Agreement has been prepared in duplicate and, after the

10

13



signing and affixing of seals hereon, each Party shall retain one (1) original hereof.

Guangdong Sanyo Air Conditioner Co., Ltd.          Prem Sales Limited

By _____          By _____

Name: Katsumi Morito          Name: Henry Patel

Title: Managing Director          Title:   C.E.O

11

14



**ANNEX 1   List of the Equipment**

(I) Tooling

| Product Model No. | No. | Parts Code | Parts Name | Material | Dimension | Use for | Price (US$) |
|---|---|---|---|---|---|---|---|
| | | | For Plate | | | | |
| STW0923C2P-A | 1 | 851 2 4139 185 00 1 | TUBE SHEET EVAP R | *SAZC-NNA18 | T0.6 | Plate | 10 |
| STW0923H2P-A | 2 | 851 2 4140 193 00 1 | TUBE SHEET EVAP L | *SAZC-NNA18 | T0.6 | Plate | 10 |
| STW1223C2P-A | 3 | 851 2 4142 207 00 2 | TUBE SHEET COND R | *SAZC-NNA18 | T0.6 | Plate | 10 |
| STW1223H2P-A | 4 | 851 2 4143 210 00 2 | TUBE SHEET COND L | *SAZC-NNA18 | T0.6 | Plate | 10 |
| | 5 | 851 2 1314 265 01 2 | STOPPER | SUS301-CSP | T0.4 | Plate | 20 |
| | 6 | 851 2 1505 433 01 0 | PL IND SW | SGCC-CX-Z18 | T0.4 | Plate | 20 |
| | 7 | 852 2 1514 457 01 0 | MTG | S65CM | T0.35 | Plate | 20 |
| | 8 | 851 2 2201 277 XX 7 | PL BOT | #SPG-UL-73 | T1.0 | Plate | |
| | 9 | 852 2 2201 278 XX | PL BOT | #SPG-UL-73 | T1.0 | Plate | 3,280 |
| | 10 | 851 2 2201 276 XX 7 | PL BOT | #SPG-UL-73 | T1.0 | Plate | |
| | 11 | 851 2 2201 276 XX 6 | PL BOT | #SPG-UL-73 | T1.0 | Plate | |
| | 12 | 851 2 2202 306 XX 7 | PL PTN | | T0.6 | Plate | 3,095 |
| | 13 | 851 2 2202 305 01 5 | PL PTN | #SPG-UL-70 | T0.6 | Plate | 238 |
| | 14 | 851 2 2202 302 01 5 | PL PTN | #SPG-UL-70 | T0.6 | Plate | 1 |
| | 15 | 851 2 2335 225 01 1 | CSG EVAP | #SPG-UL-73 | | Plate | |
| | 16 | 851 2 2309 733 00 2 | PL MTG | #SPG-UL-71 | T0.6 | Plate | 20 |
| | 17 | 851 2 2309 734 00 2 | PL MTG | #SPG-UL-71 | T0.6 | Plate | 20 |
| | 18 | 851 2 2309 730 00 1 | PL MTG | #SPG-UL-71 | T0.6 | Plate | 20 |
| | 19 | 851 2 2309 731 00 2 | PL MTG | #SPG-UL-71 | T0.6 | Plate | 20 |
| | 20 | 851 2 2309 732 00 1 | PL MTG | #SPG-UL-71 | T0.6 | Plate | 20 |
| | 21 | 851 2 1502 122 00 3 | SCREEN | SECC | T0.5 | Plate | 20 |
| | 22 | 851 2 2309 808 00 0 | PL MTG | #SPG-UL-71 | T0.6 | Plate | 20 |
| | 23 | 851 2 2202 301 00 5 | PL CHIP PTN | #SPG-UL-78 | T0.6 | Plate | 20 |
| | 24 | 851 2 2335 252 02 4 | COVER | #SPG-UL-70 | T0.6 | Plate | 20 |
| | 25 | 851 2 1502 152 01 3 | LOWER | #SPG-UL-70 | T0.6 | Plate | 20 |
| | 26 | 851 2 2961 329 01 0 | PL CNV | SGCC-CX-Z18 | T0.5 | Plate | 20 |
| | 27 | 851 2 2961 380 01 4 | PL MTG F-M | #SPG-UL-70 | T0.6 | Plate | 400 |
| | 28 | 851 2 2961 722 00 0 | ANGLE REINF | SGCC-CX-Z18 | T1.2 | Plate | 50 |
| | 29 | 851 2 2961 705 01 1 | PL MTG | SGCC-CX-Z18 | T1.0 | Plate | 50 |
| | 30 | 851 2 2961 721 00 0 | ANGLE REINF | SGCC-CX-Z18 | T1.2 | Plate | 50 |
| | 31 | 851 2 2961 131 01 3 | MTG | #SPG-UL-70 | T0.9 | Plate | 50 |



| | | | | | | |
|---|---|---|---|---|---|---|
| 32 | 851 2 2359 305 00 1 | PL WTG | -SA2 - NRA16 | T0.6 | Plate | 20 |
| 33 | 851 2 2807 168 00 1 | GRN TOP COND | -SPA-6L-T0 | T0.7 | Plate | 610 |
| 34 | 851 2 2807 174 01 0 | ELEC J-B | SGCC-DX-Z18 | T0.6 | Plate | 10 |
| 35 | 851 2 2814 297 01 2 | PL WTG SW | SGCC-DX-Z18 | T0.6 | Plate | 10 |
| 36 | 851 2 30 3 143 05 0 | PL WTG ELEC J-B | SGCC-DX-Z18 | T0.6 | Plate | 10 |
| 37 | 852 2 5801 212 10 7 | CLIP CAPACITOR | -SSC03-NNZ12 | T0.6 | Plate | 20 |
| 38 | 851 2 2807 118 00 1 | PL | A30E2P-H34 | T1.2 | Plate | 20 |
| 39 | 851 2 2812 132 00 2 | BLADE | A50 9P-H34 | T0.3 | Plate | 20 |
| 40 | 851 2 2812 118 00 2 | BLADE | A50E2P-H34 | T0.3 | Plate | 20 |
| 41 | 852 2 2814 315 01 0 | RING | SPS3L-N | T1.2 | Plate | 20 |
| 42 | 852 2 2807 128 01 1 | PL | SPS3L-N | T1.2 | Plate | 20 |
| | | | | | | |
| | | For Plastic | | | | |
| 1 | 851 2 2151 262 03 4 | HANDLE | HPL-XS-B1 | | Plastic | 8,520 |
| 2 | 851 2 2807 193 04 2 | FILTER | HPL-XS-B1 | | Plastic | 50 |
| 3 | 851 2 2801 251 01 2 | HANDLE | HPL-XS-N-70 | | Plastic | 710 |
| 4 | 851 2 2807 227 01 1 | TOP SW | HPL-XS-N-70 | | Plastic | 50 |
| 5 | 851 2 2801 229 01 0 | HANDLE | HPL-XS-N-70 | | Plastic | 710 |
| 6 | 851 2 2213 143 01 8 | PL WTG FILTER | HPL-XS-N0 | | Plastic | 550 |
| 7 | 851 2 2807 168 01 5 | SPONGE FILTER ASSY | | | Plastic | 1,190 |
| 8 | 851 2 2807 184 00 2 | HANDLE | HPL-XS-N-70 | | Plastic | 20 |
| 9 | 851 2 2472 152 00 0 | SLEEVE INS | HGUH-XS-00 | | Plastic | |
| 10 | 851 2 2472 546 04 1 | TOP COND | HGUH-XS-N | | Plastic | 1,190 |
| 11 | 851 2 2472 547 01 0 | CLIP WIRE | HGUH-XS-N | | Plastic | 20 |
| 12 | 852 2 2807 189 01 0 | CLIP THERMO | HGUH-XS-N | | Plastic | 20 |
| 13 | 852 2 2807 189 01 0 | CASE | HGUH-XS-N | T1 | Plastic | |
| 14 | 851 2 2807 189 01 0 | TOP FILTER ASSY | | | | 520 |
| | | | | | | |
| | | For Foam | | | | |
| 1 | 851 2 2807 189 01 0 | FILTER | HPL-XS-N | 40E-AI | Foam | 50 |
| 2 | 851 2 2807 189 01 0 | FILTER COVER | HPL-XS-N | 40E-AI | Foam | 20 |
| 3 | 851 2 2807 189 01 0 | TOPPER | HPL-XS-N | 40E-AI | Foam | 20 |
| 4 | 851 2 2807 189 01 0 | TOP COVER | HPL-XS-N | 40E-AI | Foam | 20 |
| 5 | 851 2 2807 189 01 0 | TOPPER | HPL-XS-N | 40E-AI | Foam | 20 |
| | | For Plate | | | | |
| STW0923C3-A | 1 852 2 2807 189 01 0 | SHEET EVAP R | -XS-Z18 | T0.3 | Plate | 10 |
| STW0923H3-A | | SHEET EVAP L | -XS-Z18 | T0.3 | Plate | 10 |

| | | | | | | |
|---|---|---|---|---|---|---|
| STW1223C3-A | 3 | | TUBE SHEET COND R | | T0.6 | Plate | 10 |
| STW1223H3-A | 4 | | TUBE SHEET COND L | | T0.6 | Plate | 10 |
| | 5 | | ELEC J-B | | T0.6 | Plate | 50 |
| | 6 | | ELEC J-B | | T0.6 | Plate | 50 |
| | 7 | | PLATE ELEC J-B | | T0.6 | Plate | 50 |
| | 8 | | SW | | T0.6 | Plate | 50 |
| | | | | | | |
| | | | **For Plastic** | | | |
| | 1 | | AD | | | Plastic | 200 |
| | 2 | | PLATE LAMP | | | Plastic | 200 |
| | | | **For Fan** | | | |
| STW0923C3-AA | 1 | | TUBE SHEET EVAP R | | T0.6 | Plate | 50 |
| STW0923H3-AA | 2 | | TUBE SHEET EVAP L | | T0.6 | Plate | 50 |
| STW1223C3-AA | 3 | | TUBE SHEET COND R | | T0.6 | Plate | 50 |
| STW1223H3-AA | 4 | | TUBE SHEET COND L | | T0.6 | Plate | 50 |
| | | | | | | Total | |

(II) Fans

| Equipment No. | SMA No. | Equipment Name | Price (US$) | |
|---|---|---|---|---|
| Fan-1 | | | |  |
| Fan-2 | | FAN MOTOR | | |

| | | | | |
|---|---|---|---|---|
| Fan-3 | GS-02-15-01-2 | ASSEMBLE M/C No.1 | 1,380 |  |
| Fan-4 | GS-02-15-01-3 | ASSEMBLE M/C No.2 | 1,680 | |
| Fan-5 | GS-02-15-01-4 | SPINNING M/C | 1,870 | |
| Fan-6 | GS-02-15-01-5 | BONDING M/C | 1,000 | |
| Fan-7 | GS-02-15-01-6 | BALANCING M/C | 900 | |
| Fan-8 | | DRYER | 100 | |

16

| | | | | |
|---|---|---|---|---|
| Fan-9 | | CIE | 2.200 | |
| | | Total | 13,000 | |

16

19

Exhibit 1B

**From:**    katsumi.morito@sanyo.com
**Sent:**    Thursday, February 03, 2011 10:28 AM
**To:**      henry@premsales.net
**Cc:**      koji.mori@sanyo.com; hideyuki.kanaka@sanyo.com; IMCEAEX-_O=SANYO_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPDLT+29_CN=RECIPIENTS_CN=Hiroshi+2Enozaki@sanyo.com; kazuhiro.shimaoka@sanyo.com; shuji.kakami@sanyo.com; tatsushi.yamashita@sanyo.com

**Subject:** RE: Follow up e mail for meeting at GREE Zhuhai last year

Henry-san

I am sorry that I forget 1 issue.

We GSA have fan equipment, so we need your direction.

Where should we 7 tooling and equipment deliver?

Please let us know your direction.

Best Regards,


袁戸　克美
広東三洋空調機有限公司
中国広東省佛山市江湾一路弱塘西二街9－11号
TEL:+86－(0757)－8270－9768
FAX:+86－(0757)－8227－5149
mobile:+86－138－2770－2631
e-mail;katsumi.morito@sanyo.com
．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．．
Katsumi Morito
Guangdong SANYO Air Conditioner Co., Ltd
9-11 Bitang West Second Street Jiangwan First Road Foshan, Guangdong Province,China
-----Original Message-----
From: Morito, Katsumi (袁戸　克美)
Sent: Tuesday, February 01, 2011 7:18 PM
To: 'henry@premsales.net'
Cc: Mori, Koji (森　弘治); Kanaka, Hideyuki (鹿中　秀行); Nozaki, Hiroshi (酔尚　浩); Shimaoka,
Kazuhiro (嶋岡　一博); Kakami, Shuji (各務　修司); Yamashita, Tatsushi (山下　哲史)
Subject: Follow up e mail for meeting at GREE Zhuhai last year


Henry-san,

You know that our GSA will be closed by March 2011.
Especially SANYO need your reply for item  below (1) and (2) urgently.
Your kindly understanding is always appreciated.

Please look at one by one and reply of your direction.

(1) 2 sets of drawing : need  your instruction

(2) please let us know where we should the 7 tooling  and equipment deliver?

Best Regards,


袁戸　克美
広東三洋空調機有限公司
中国広東省佛山市江湾一路弱塘西二街9－11号
TEL:+86－(0757)－8270－9768
FAX:+86－(0757)－8227－5149
mobile:+86－138－2770－2531

e-mail: katsumi.morito@sanyo.com

......................................................................

Katsumi Morito

Guangdong SANYO Air Conditioner Co., Ltd

9-11 Bitang West Second Street Jiangwan First Road Foshan, Guangdong Province,China

Exhibit 1C

From:   Henry@mail.premsales.net
Sent:   Monday, March 21, 2011 10:50 AM
To:     tetsushi.yamashita@sanyo.com; hideyuki.hanke@sanyo.com ; katsumi.morito@sanyo.com
Cc:     allatron@mindspring.com
Subject: Tooling....

Hello Gentlemen! Hope things are getting back to somewhat of a Normalcy after a very tragic earth quake and tsunami two weeks ago. Event such as this one brings out the Best in one, along with stronger will and commitment. Wish you and everyone in Japan The Very Best.

Yamashita-san had mentioned, Sanyo has found more PTAC Tooling after transfer of tooling to GREE. Please provide me with All remaining tooling list, parts, PTAC units and location where it is stored.

Kind Regards........

Thank You,

Henry Patel
President / CEO
Prem Sales Ltd.
PH: 806-745-6651
FAX:806-745-2916

Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

PREM SALES, LTD.

                Plaintiff,

     v.

SANYO ELECTRIC AIR CONDITIONING CO.,
LTD.;
And
SANYO AIR CONDITIONERS
MANUFACTURING, SINGAPORE, PTE.,
LTD.;
And
SANYO ELECTRIC CO., LTD.;
And
BUSINESS ENTITY DOES 1-10;

                Defendants.

Civil Action No. 5:11-CV-136-C

## DECLARATION OF XIAOHU MA
## IN SUPPORT OF DEFENDANT'S MOTION FOR AN ORDER TO QUASH SERVICE
## AND/OR DISMISS OR, IN THE ALTERNATIVE,
## TO COMPEL ARBITRATION AND DISMISS OR STAY ALL CLAIMS

I, XIAOHU MA, declare as follows:

     1.     I am a partner at Morrison & Foerster, LLP. I am admitted to practice law in the

People's Republic of China ("PRC").

     2.     The requirements of contract formation under PRC law differ from those of

common law jurisdictions. For example, consideration is not required as an element of contract

formation under PRC law.

     3.     I have reviewed the December 16, 2009 Sale and Purchase Agreement ("Tooling

Agreement") between Guangdong SANYO Air Conditioner Co., Ltd. ("Guangdong SANYO")

and Prem Sales, Ltd. ("Prem"), and I am satisfied that, on its face, it is a valid agreement under

PRC law.

tk-418926

1

4.      I note that Article 12 of the Tooling Agreement contains an arbitration clause calling for disputes to be arbitrated in Hong Kong under International Chamber of Commerce (ICC) Rules.  PRC law will respect the decisions made by the arbitral tribunal in accordance with ICC arbitration rules as per the arbitration clause of the Tooling Agreement.

5.      As the parties chose ICC arbitration to govern disputes arising out of or in connection with the Tooling Agreement, any decision by the arbitrator, made according to ICC arbitration rules to allow a nonsignatory to join an arbitration proceeding, will be respected under PRC law.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 8th day of August, 2011, in Hong Kong.

XIAOHU MA

# Exhibit 3

2011 08/08/月 16:53    株式会社 ビーレイク      ▲ FAX番号:0942-35-6524             P. 002

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

PREM SALES, LTD.

                              Plaintiff,

            v.

SANYO ELECTRIC AIR CONDITIONING CO.,
LTD.;
And
SANYO AIR CONDITIONERS                    Civil Action No. 5:11-CV-136-C
MANUFACTURING, SINGAPORE, PTE.,
LTD.;
And
SANYO ELECTRIC CO., LTD.;
And
BUSINESS ENTITY DOES 1-10;

                              Defendants.

### DECLARATION OF KAZUHISA MIIKE
### IN SUPPORT OF DEFENDANT'S MOTION FOR AN ORDER TO QUASH SERVICE
### AND/OR DISMISS OR, IN THE ALTERNATIVE,
### TO COMPEL ARBITRATION AND DISMISS OR STAY ALL CLAIMS

I, KAZUHISA MIIKE, declare as follows:

    1.    I am the Director of SANYO Asia Pte., Ltd. ("SANYO Asia"). I have been in the present position since April 2009. I have personal knowledge of the following facts through my position as Director which includes responsibility of the PTAC related business. I am authorized to make this declaration on behalf of SANYO Asia.

    2.    SANYO Asia is a Singaporean entity incorporated under the laws of Singapore. It does not have any employees or operations in the United States. At all relevant times, SANYO Asia and another entity with which it merged in 2009, SANYO Air Conditioners Manufacturing, Singapore. Ltd. have been wholly-owned subsidiaries, directly or indirectly, of SANYO Electric Co. Ltd. SANYO Asia has about 35 employees and operates in the consumer electronics industry.

1

tk-418768

2011/08/08/月 16:53        株式会社 ビーレイク              ▲ FAX番号:0942-35-6524                P. 003

3.      On July 15, 2011, SANYO Asia received a copy of the complaint and summons for the above-referenced action from the Secretary of State of Texas. Attached marked Exhibit A is a true and correct copy of the complaint, summons and cover letter we received from the Secretary of State of Texas. The complaint and summons were directed to "SANYO Air Conditioners Manufacturing, Singapore, Pte., Ltd."

4.      SANYO Air Conditioners Manufacturing, Singapore, Pte., Ltd. was a Singaporean entity that engaged in the manufacture of Packaged Terminal Air Conditioners ("PTACs") until 2009.

5.      On October 1, 2009 SANYO Air Conditioners Manufacturing, Singapore, Ltd. was merged into SANYO Asia. Since that time the entity "SANYO Air Conditioners Manufacturing, Singapore, Ltd." ceased to exist. There is currently no existing entity called "SANYO Air Conditioners Manufacturing, Singapore. Ltd."

6.      On October 28, 2002, I understand that SANYO Air Conditioners Manufacturing, Singapore, Ltd. entered into a Purchase and Sales Agreement ("Distribution Agreement") with Prem Supply, Inc. ("Prem Supply"), under which the SANYO entities agreed to sell PTACs and related service parts to Prem Supply. Attached marked Exhibit B is a true and accurate copy of the Distribution Agreement.

7.      As explained above, on October 1, 2009, SANYO Air Conditioners Manufacturing, Singapore, Ltd. merged into SANYO Asia, causing SANYO Asia to become party to the Distribution Agreement. I understand that Prem was aware of the merger at least by August 2010.

8.      On August 20, 2010, SANYO Electric and SANYO Asia terminated the Distribution Agreement pursuant to Article 17 by sending formal notice of their intent to terminate to Prem Supply. Attached marked Exhibit C is a copy of a notice of termination that I signed which states, among other things, that "SANYO Air Conditioners Manufacturing Singapore Pte., Ltd was merged with SANYO Asia Pte., Ltd as of 1st October 2009."

2

tk-418768

2011/08/08/月 16:53   株式会社 ビーレイク   ▲ FAX番号:0942-35-6524   P.004

9. Since that time, SANYO Asia has continued to have dealings with Prem Sales and currently supplies a small volume of PTAC related parts to Prem Sales in accordance with Section 10.04 of the Distribution Agreement.

10. On March 17, 2011, I received a letter from Mr. Lamar Treadwell, counsel for Prem, who requested that SANYO negotiate with Prem for damages it allegedly suffered arising from the termination of the Distribution Agreement.

11. SANYO Asia (along with SANYO Electric) filed a request for arbitration with the Japan Commercial Arbitration Association against Prem Supply on June 16, 2011, fourteen days before this action was commenced. The JCAA arbitration and this litigation involve the same issues.

12. SANYO Asia remains ready willing and able to arbitrate this dispute.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of August, 2011, in Japan.



KAZUHISA MIIKE

3

tk-418768

27

# Exhibit 3A

## The State of Texas



Citations Unit
P.O. Box 12079
Austin, Texas 78711-2079

Phone: 512-463-5560
Fax: 512-463-0873
TTY (800) 735-2989
www.sos.state.tx.us

### Secretary of State

July 6, 2011

Sanyo Air Conditioning Manufacturing
Singapore PTE Ltd
No. 6 Commonwealth Lane
#03-01/02
GMTI Building  149547
Singapore

| 2011-201495-2 |
| :---: |
| Include reference number in all correspondence |

RE: Prem Sales Ltd VS Sanyo Electric Air Conditioning Co Ltd and Sanyo Air
Conditioners Manufacturing Singapore Pte Ltd and Sanyo Electric Co Ltd and Business
Entity Does 1-10
72nd Judicial District Court Of Lubbock County, Texas
Cause No: 2011557939

Dear Sir/Madam,

Pursuant to the Laws of Texas, we forward herewith by REGISTERED MAIL, return receipt
requested, a copy of process received by the Secretary of State of the State of Texas on July 5,
2011.

REGISTERED MAIL #RB578632193US

Refer correspondence to:

Lamar D. Treadwell
Attorney at Law
551 West Cordova Rd #720
Santa Fe, NM 87505

Sincerely,

Helen Lupercio
Team Leader, Citations Unit
Statutory Documents Section

hl/vc
Enclosure

28

<u>CITATION</u>
<u>THE STATE OF TEXAS</u>

TO:     Sanyo Air Conditioning Manufacturing, Singapore, PTE. Ltd.
        Home or Home Office:   No. 6 Commonwealth Lane, #03-01/02 GMTI Building, Singapore, 149547
        By Serving The Texas Secretary of State:  Citations Unit
                              P.O. Box 12079
                              Austin, Texas 78711-2079

                                                                    Defendant Greetings:

                                    NOTICE

You have been sued.  You may employ an attorney.  If you or your attorney do not file a written answer with the clerk of the court
who issued this citation by 10 o'clock a.m. on the Monday following the expiration of 20 (twenty) days after you have been served
this citation and Original Petition For Fraudulent Inducement, Civil Theft, and Declaratory Judgment with Plaintiff's First Set
of Requests for Production and Inspection and Plaintiff's First Set of Requests for Admissions, a default judgment may be taken
against you.

Said Plaintiffs' Original Petition For Fraudulent Inducement, Civil Theft, and Declaratory Judgment with Plaintiff's First Set
of Requests for Production and Inspection and Plaintiff's First Set of Requests for Admissions was filed in the 72nd District
Court of Lubbock County, Texas, on June 30, 2011 .  The file number of said suit being Cause Number 2011-557,939, and styled:

                              Prem Sales, Ltd.,
                                  *Plaintiff*
                                     Vs.
        Sanyo Electric Air Conditioning Co., Ltd. And Sanyo Air Conditioners Manufacturing, Singapore, Pte., Ltd. And Sanyo
                    Electric Co., Ltd., and Business Entity Does 1-10,
                                  *Defendant*

The nature of Plaintiffs' demand is set out and shown by a true and correct copy of Plaintiffs' Original Petition For Fraudulent
Inducement, Civil Theft, and Declaratory Judgment with Plaintiff's First Set of Requests for Production and Inspection and
Plaintiff's First Set of Requests for Admissions, accompanying this citation, and made a part thereof.

Plaintiff is represented by:
Lamar D. Treadwell, 551 West Cordova Road #720, Santa Fe, New Mexico 87505, (505) 660-0602.

The officer executing this writ shall promptly serve the same according to requirements of law, and the mandates hereof, and make
due return as the law directs.

Issued and given under my hand and seal of said Court at Lubbock County, Texas, this Thursday, June 30, 2011, at 4:19 PM.


                              Barbara Sucsy, District Clerk
                              72nd District Court
                              P.O. Box 10536 (79408)
                              904 Broadway
                              Lubbock, Texas 79401
                        By _____ Deputy
                              Sammy W. Smith


                                       RECEIVED
                                  SECRETARY OF STATE

                                    JUL - 5 2011

                                     11:00 AM
                    201495-2  CITATIONS UNIT

                                                                              29.



CAUSE NO. 2011-557,939

| | | |
|---|---|---|
| PREM SALES, LTD. | § | IN THE 72nd DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| V. | § | |
| | § | |
| SANYO ELECTRIC AIR | § | |
| CONDITIONING CO., LTD. | § | |
| And | § | |
| SANYO AIR CONDITIONERS | § | OF |
| MANUFACTURING, SINGAPORE, | § | |
| PTE., LTD. | § | |
| And | § | |
| SANYO ELECTRIC CO., LTD., | § | |
| And | § | |
| BUSINESS ENTITY DOES 1-10 | § | |
| Defendants. | § | LUBBOCK COUNTY, TEXAS |

## PLAINTIFFS' ORIGINAL PETITION
### FOR FRAUDULENT INDUCEMENT, CIVIL THEFT,
### AND DECLARATORY JUDGMENT

Prem Sales, LLC formerly *Prem Sales, Ltd*[1], Plaintiff, complains of the failures, errors, omissions, negligence, deceptive, deceitful, and unlawful conduct of Defendants, SANYO Electric Air Conditioning Co., Ltd., SANYO Air Conditioners Manufacturing, Singapore, PTE., Ltd., and SANYO Electric Co. Ltd., as follows:

### A.   Introduction of the Parties

1.   **Prem Sales LLC (PREM)**, formerly Prem Sales, Ltd. is a Texas business entity engaged in the business of marketing, distribution, and selling of packaged terminal air conditioners (PTACS) in Texas and the United States.

2.   **SANYO Electric Air Conditioning Co., Ltd.** (SEAC) is a corporation formed under the laws of Japan that is engaged in the design, sale, and marketing of packaged terminal air conditioners (PTACS) into the United States and Texas.

[1] Change of name on December 21, 2010.

3.   SANYO Airs Conditioners Manufacturing, Singapore, PTE., Ltd. (SAMS) is a corporation formed under the laws of Singapore to manufacture PTACS for sale and distribution into the United States and Texas.

4.   SANYO Electric Co., Ltd. (Sanyo) is a corporation formed under Japanese Law that operates worldwide with numerous wholly owned subsidiaries. Sanyo was targeted and acquired by Panasonic Corporation, as a wholly owned subsidiary on December 21, 2010.

4.1   **Business Entity Does 1-10** are those entities that were beneficiaries of any fraudulent transaction committed by any other defendant, and who had knowledge of the fraud—imputed, constructively or actually—and may not retain possession of any property transferred as a result of the fraud. Also any beneficiary of fraud is jointly or severally liable, and after discovery, will be further identified.

### B.   Jurisdiction and Venue

5.   **Jurisdiction:**  The Court has jurisdiction over the lawsuit because the amount in controversy exceeds this Court's minimum jurisdictional requirements. Also, the Court has jurisdiction over the Defendants as follows:

5.1   Under the Texas long arm statute, CIVIL PRACTICE & REMEDIES CODE (CPRC) §17.042, because each Defendant has engaged in acts constituting doing business in Texas through contractual relationships directed into the state by:

a)   SEAC and SAMS entering into a contract with Prem Supply, Inc. The 2002 contract whereby SEAC and SAMS designed, manufactured, and imported PTACs for distribution in contemplation of sales in Texas and the United States.

b)   SEAC and SAMS controlling the distribution system bringing the PTACs to PREM.

c)   SEAC and SAMS controlling the use of the Sanyo brand or trademark under conditions of use tied to advertising and marketing indicating an intent to serve the Texas and the United States market;

d)   Selling products for which SEAC and SAMS anticipated performing contracts for parts supply and supporting warranty work in Texas, as well as all the United States.

e)   Sanyo sent representatives to Lubbock, Texas on more than one occasion to make affirmative representations for the guidance of PREM in its business dealings with SEAC, SAMS, Guangdong Sanyo Air Conditioner Co., Ltd. (Guangdong-Sanyo) and Sanyo. The business dealings at issue arise out of parties' prior transactions, as well as being a result of the intended Sanyo-Panasonic merger for which all defendants had pecuniary interest in transactions being represented. The intended merger led Sanyo to take the lead representative role for it and its subsidiaries to obtain the sale of its inventory of PTACs and of the tooling to make the PATACS. As such, Sanyo induced PREM to rely upon its representations, made in Lubbock, Texas, which false representations caused PREM to suffer injury and damage in Lubbock, Texas.

f)   Sanyo has committed one or more torts, in whole or in part in Texas, e.g., fraudulent inducement and civil theft.

5.2   Defendants herein have purposely availed themselves of the privilege of conducting business within Texas and United States by deliberately designing PTACS for the American market, and by sending and selling products to American companies and consumers through its American distributors, SANYO-Fisher and PREM.

6.   **Due process is consistent with protecting American business from foreign tortuous conduct.** Texas and the United States have substantial social policies that weigh in favor of retaining jurisdiction to resolve in the most efficient manner the resolution of controversies to protect American consumers and businesses. Specifically, regarding tortuous conduct that jeopardizes a local business, jurisdiction is justified when juxtaposed against multi-national global entities that take undue advantage in the forum to achieve market share when advantageous. When a turn of events is not advantageous — such as here, arising out of a merger — to tortuously abandon a Texas business without

---

Plaintiff's Original Petition          Page 3 of 29

consideration of being held liable, is inconsistent with due process principles, public policy, and foreign trade relations.

7.     **Venue:** As to venue, all or a substantial part of the events or omissions that gave rise to the Plaintiff's claims arose in Lubbock County under CIVIL PRACTICE AND REMEDIES CODE (CPRC) §15002(a)(1) and §15.005. Also, the convenience of the parties, witnesses, and justice is best served by venue in Lubbock County, Texas. Under CPRC §15.033 this is a suit for breach of warranty, implied or express, by a manufacturer, supplier, or distributor of goods in which all or a substantial part of the events of omissions giving rise to the claim occurred in Lubbock County, the residence of plaintiff at the time the cause of action accrued.

### C.     Discovery Control Plan - Level III

8.     Plaintiff intends to conduct discovery under a Level III plan tailored to the circumstances of the suit under TEXAS RULES OF CIVIL PROCEDURE (TRCP) Rule 190.4 because this suit involves monetary relief over $10,000,000.00, excluding court costs, prejudgment interest, and attorney fees.

   8.1     This controversy involves tortuous conduct for which witnesses are located in the United States, China, Japan, and Singapore that will require the appointment of a special master for discovery.

### D.     Request for Disclosure

9.     Under Tex. R. Civ. P. Rule 194, Plaintiff requests that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

### E.     Service of Discovery

10.     By service of process of this lawsuit, plaintiff serves upon Defendants *Requests for Production of Documents* and *Requests for Admission*. The answers are to be served upon

Plaintiff's Original Petition          Page 4 of 29

Plaintiff's counsel at 551 W. Cordova Rd. #720, Santa Fe, New Mexico 87505, or elsewhere by other agreement, no later than 50 days after service of this lawsuit.

### F.   Parties and Service of Citation

11.   **Plaintiff:** Prem Sales, LLC, a Texas limited liability corporation[2], is authorized to do business in the State of Texas.

12.   **Defendants:**

12.1   SEAC, SANYO ELECTRIC AIR CONDITIONING, Co., LTD. is a Japanese company having its principal office at: 1 Otsuki-Cho Ashikaga-City, Tochigi 326-8534 Japan. Because Defendant engages in business in Texas and has done so at all material times but does not maintain a place of regular business in Texas or a designated agent on whom process can be served, service on Defendant should be made by serving the Texas Secretary of State, Capital Station, Austin, Texas 78711, and forwarded to Defendant's home or home office at 1 Otsuki-Cho Ashikaga-City, Tochigi 326-8534 Japan.

12.2   SAMA, SANYO AIR CONDITIONING MANUFACTURING, SINGAPORE, PTE. LTD, is a foreign corporation, incorporated in Singapore, whose principle business office is: No. 6 Commonwealth Lane, #03–01/02 GMTI Building, Singapore, 149547. Because Defendant engages in business in Texas and has done so at all material times but does not maintain a place of regular business in Texas or a designated agent on whom process can be served, service on Defendant should be made by serving the Texas Secretary of State, Capital Station, Austin, Texas 78711, and forwarded to Defendant's home or home office at No. 6 Commonwealth Lane, #03–01/02 GMTI Building, Singapore, 149547.

12.3   Sanyo, SANYO ELECTRIC CO., LTD. is a Japanese corporation whose headquarters is located at: 1-1-1 Sakara Olsumi-Machi, Ora-Gun, Gunma 370-0596, Japan. Because Defendant engages in business in Texas and has done so at all

---

[2] Located at: 6021 Ave. A, Lubbock, Texas 79404.

material times but does not maintain a place of regular business in Texas or a designated agent on whom process can be served, service on Defendant should be made by serving the Texas Secretary of State, Capital Station, Austin, Texas 78711, and forwarded to Defendant's home or home office at 1-1-1 Sakara Olsumi-Machi, Ora-Gun, Gunma 370-0596, Japan.

### G.   Introduction to the Business Relationships of the Parties

13.   In 1995, PREM entered into distributing and selling "commercial use" PTACS for numerous manufacturers, primarily in hotels nationwide. Prem Supply, Inc. was a related entity contracting for the manufacture and supply of PTACs from SEAC and SAMS.

13.1   On October 28, 2002, Prem Supply, Inc. entered into a contract formed under the laws of Japan with SEAC and SAMS to become a distributor within the Territory of the United States to sell specific Sanyo PTACS by license or permission. In doing so, Prem Supply, Inc. agreed to not take on distributing or selling PTACS for any additional manufacturers. Conversely, when other companies, such as Amana, learned of Prem Supply, Inc.'s desire to sell Sanyo PTACs, Amana retaliated by refusing to allow Prem Supply, Inc. or PREM to continue selling Amana PTACs to its customers.

13.2   Prem Supply Inc.'s initial investment in the distributorship was required by the parties 2002 contract and included the following:

    a)   Hiring and training a qualified (multi-lingual) sales staff;

    b)   Dedicating office and clerical personnel to trade the products; and

    c)   Dedicating warehouse and office space to carry an inventory of the product.

13.3   In reliance on the contract promises of supply and other contract representations, Prem Supply, Inc. built a 25,000 square-foot warehouse and office facility on several acres of land in Lubbock, Texas.

---

Plaintiff's Original Petition                    Page 6 of 29

13.4  **Subsequent investments** by Prem Supply, Inc. including by PREM on behalf of Prem Supply, Inc., occurred over a period of time by Memorandum of Understanding (MOU) and by conduct of the parties by which resources of mutual collaboration (engineering) and monies were invested into patent re-design, product re-development improvements, inventory purchases, and increasing market share. The MOUs and course of dealing of the parties became part of the 2002 contract by Japanese Law.

14.  **Supply terms under the 2002 Agreement** between SEAC, SAMS and Prem Supply, Inc. obligated SEAC and SAMS to fulfill orders placed by Prem Supply, Inc. in Lubbock by shipping the PTACS to Lubbock, Texas. SEAC and SAMS were also obligated under the 2002 Contract, Article 10.04, to secure availability of all service parts (dating from the time of sale in Texas) for:

14.1  **Five years** for non-functional parts; and

14.2  **Seven years** for functional parts (*including* printed circuit board assembly, indicator panel, heat exchanger, fan motor, etc.)

15.  Prem Supply, Inc. was financially obligated to carry sufficient parts for performance of warranty and repairs. SEAC and SAMS were obligated to manufacturer, ship, and supply sufficient parts for repair and replacement of its product placed into the stream of commerce in Texas and the United States. In the event that supply under the 2002 contract was to cease, then Prem Supply, Inc. was allowed to place a sufficiently large order for parts to be able to meet the five and seven year service requirements.

16.  **SEAC and SAMS never terminated the 2002 contract for any cause.** Sanyo first breached this contract, unlawfully acting in behalf of SEAC and SAMS by refusing to honor its terms using the excuse of the Sanyo-Panasonic merger.

16.1    **Prem Supply Inc.'s performances under the contract** were proper and Prem Supply, Inc. always paid its bills, often in advance in order to assist SEAC and SAMS with their cash flow difficulties.

16.2    **Contract termination procedure:** The contract was for one two-year period and thereafter, with automatic one-year renewals unless terminated in writing **two months prior to** the end of the initial term or any renewal term (i.e., October 28). See 2002 Contract, Article 17.02.

16.3    **Article 23 of the 2002 Contract – Assignment –** states the following:

*Neither this Agreement nor any right hereunder shall be assignable or transferable to any third party or parties by either party hereto without the prior written approval of the other party hereto.*

## H.    Factual Background of the Present Controversy

17.    **Defendants' breach of the 2002 Contract:** PREM and Prem Supply, Inc. was so successful selling Sanyo PTACS that by 2009 PREM had the third largest share of its type in the non-split PTAC market, with only GE and Amana being larger. In order to achieve this feat, Prem Supply, Inc. and PREM effectively eliminated similar competition.

17.1    FIRST, PREM competed by contributing significant product design improvements for superior performance in the market with almost non-existent warranty expense.

17.2    SECOND, in order to introduce the Sanyo brand PTACS to the United States market PREM lowered its margins considerably below is competitors margins, making less net profits, achieving market entry.

17.3    THIRD, the competition was charging for the costs of freight, warehousing, and warranty service, PREM did not.

---

Plaintiff's Original Petition          Page 8 of 29

17.4    Sanyo's sales and distribution company in the United States, **Sanyo-Fisher**, a division of SANYO, North America Corporation (headquartered at: 21605 Plummer Street, Chatsworth, California 91311) was not able to develop a significant market penetration in the hotel PTAC market with Sanyo brand PTACs, which market was eventually developed and taken over by PREM. For years, PREM had to contend with SANYO-Fisher as a competitor.

17.5    Besides the Sanyo-Fisher company, other competition PREM eliminated over time in the hotel PTAC market included Trane, Carrier, Freidrich, Remington/McQuay, and LG, most of whom at various times attempted to eliminate PREM as a competitor by predatory pricing and other unfair competition or anti-trust tactics. Nonetheless, PREM survived and thrived with annual profit margins in the 15 to 19.7% range on many millions of dollars of sales, as its market share increased.

17.6    By 2009, by investment in improving the product and by establishing the Sanyo brand PTAC into the hotel market, PREM was posed to double its sales of Sanyo PTACS, as those products were now superior products in the marketplace. The new Sanyo PTAC, waiting to be produced, and for which PREM had contributed significant engineering, would be Montreal Protocol compliant using the R-410 refrigerant. PREM would have had a stronger competitive advantage in the Texas and United States markets, as other manufacturers were known to not be in early compliance, if PREM had not been precluded from manufacturing and selling the Sanyo brand PTAC.

    a)    Basically, PREM was posed to have no competition for some significant amount of time because the early compliance. This advantage would clearly have allowed PREM to overtake more market share.

    b)    Sanyo, SEAC, and SAMS were aware of the effort and resources that PREM had contributed to the product, as well as in market preparation timed to significantly increase sales of the new Sanyo brand PTAC in 2010 or late 2009.

17.7   On or about June 5 to 7, 2009, PREM was notified that Sanyo ... 'need to stop PTAC business' and that Sanyo, speaking for SEAC and SAMS, would, in fact, no longer manufacture or supply to PREM Sanyo-manufactured PTACS or parts.

— Exhibit A attached hereto and incorporated by reference herein is a copy of the parties' memorandum of that meeting in Lubbock, Texas containing line-item details that were referred to in subsequent E-mails between PREM and Sanyo. Attending the meeting were Henry Patel for Prem and Mr. Koji Mori, Mr. Susumu Sato, and Mr. Tetsushi Yamashita for Sanyo.

17.5   On August 9, 2009, Mr. Koji Mori, Deputy General Manager of the International Sales Management Division of **Sanyo** traveled to Lubbock, Texas to meet with Henry Patel President of Prem Supply, Inc. and of PREM. An E-mail memorandum was made to Mr. Mori of this visit on October 6, 2009. On this particular visit to Lubbock, Texas, as well as on other occasions, Mr. Mori and Mr. Yamashita (in different Lubbock visits) each made the following representations:

   a)   That SEAC and SAMS will no longer make PTACS for Prem Supply, Inc. or PREM, as a result of the Sanyo-Panasonic merger;

   b)   That due to PREM's substantial reliance on the Sanyo branded PTAC product, Mr. Mori and Mr. Yamashita offered to sell to PREM all the tooling for PREM to continue to manufacture the PTACS and to assure a supply of replacement parts;

   c)   That Sanyo would license or transfer all necessary patents or use licenses to allow PREM to manufacture the PTACS;

   d)   That Sanyo would deliver the tooling, suitable for manufacturing under Chinese law, to another manufacturer Sanyo was assisting in choosing (which tooling implicitly, if not explicitly was to be complete for manufacturing, such that all dies, parts, blueprints or schematics, and the software for programming the main printed circuit boards were being transferred or licensed.

e)   That engineering assistance would be provided to PREM to set up the tooling to match Sanyo plan and schematic specifications and tolerances;

f)   That although SEAC and SAMS were still under contract to supply PREM with PTACS, parts, and warranty service, Sanyo, speaking for its subsidiaries, did not intend to perform further under the 2002 contract; and

g)   Despite Sanyo's intent to not perform further under the 2002 contract, the subsidiaries, as the actual contracting parties, failed at this time to formally terminate the 2002 contract.[3]

— Exhibit B attached hereto and incorporated by reference herein is a copy of the parties' memorandum of that August 9th meeting in Lubbock, Texas containing line item details that were referred to in subsequent E-mails between PREM and Sanyo. Attending the meeting were Henry Patel for Prem and Mr. Koji Mori for Sanyo.

18.   **PREM agrees to buy the entire non-compliant inventory (Montreal Protocol[4]) upon Sanyo agreeing to sell transfer and transfer permissions to use of the tooling. Sanyo subsequently holds the tooling hostage.** PREM and Sanyo did not reach an understanding of their positions on the sale of the inventory and tooling in Lubbock until on or about late October when PREM paid monies to Sanyo under the following circumstances.

18.1   **Commercial Extortion** is what PREM experienced when it was advised that it would no longer have product to sell in the United States market unless it bought all the remaining inventory on terms dictated by Sanyo. That is, PREM was under commercial coercion to do as Sanyo wanted as follows:

---

[3] To terminate the 2002 contract, under Japanese law under these circumstances, would be dishonorable conduct. Prem Supply, Inc. could arguably assert arbitration but lose inventory to continue in business. By not terminating the contract first, Sanyo was maneuvering to place Prem Supply, Inc. into an untenable position using economic extortion that allowed Sanyo to sell off the old Freon refrigerant inventory while coercing Prem Supply, Inc. into accept tooling as a inducement to avoid seeking damages in arbitration.

[4] The Montreal Protocol (to the Vienna Convention for the protection of the Ozone Layer) phases out substances that deplete the Ozone layer.

Plaintiff's Original Petition            Page 11 of 29

a)   Buy the inventory on terms and conditions dictated by Sanyo
or Prem Supply, Inc. would have no inventory to sell.

b)   That in exchange for buying an inventory (that under the terms of the
2002 contract was manufactured only for Prem Supply, Inc. and which
could be sold only by PREM or SANYO-Fisher in the United States)
Sanyo would transfer to PREM the tooling and all rights to use the
tooling so PREM could manufacture the PTACS for itself.

c)   That PREM could continue to manufacture and sell the Sanyo  PTAC
product under its own **private brand**.

d)   That with the tooling, PREM could make the parts it needed to service
the warranties for products <u>abandoned by Sanyo</u> in the American
market.

18.2   **PREM pays for the inventory in October 2009:**  Sanyo knew that in 2010 its
already manufactured PTACs for the American market would be unsalable, and
therefore worthless because of the Montreal Protocol. In a series of in-person visits
to, and E-mails directed to Prem's headquarters in Lubbock, Texas, Sanyo's
representatives negotiated the selling and transferring the tooling tied to PREM
buying the remaining inventory. Adjustments in pricing were ongoing, but included
the tooling and its' licensing for use. Sanyo's visits to Lubbock, and Sanyo's E-mail
confirmations **constitutes the parties contract** (between merchants). Sanyo offered
the following terms on October 26, 2009.

1)   "Remittance of amount to Sanyo must be no later than 30th October
2009 (Japan time).

2)   'Technical assistance fee for Airwell's production is not included in the
above price reduction (TBD later).

3)   'Warranty expenses for Sanyo PTAC sold by PREM are covered by
this price reduction.

4)   'After this price reduction, PREM will not ask Sanyo any
compensation in the future.

5)   'Patents will not be transferred but will be licensed.

---

Plaintiff's Original Petition          Page 12 of 29

6)     'Tooling cost to be sold to PREM to be off-set by this price reduction.
... Your confirmation by return email would be much appreciated."

Prem replies by email its acceptance as follows.

"We agree to total payment requested by Sanyo in full amount.
... Conditions:
We are arranging entire amount. Due to certain communications difficulties with HK office we are still working to make it happen tonight. Mr. Yamashita is familiar with the present condition.

18.3    After PREM pays for the tooling in 2009 Sanyo represents it needs a "delivery" contract in China before it can move the tooling.  By December 2009, Sanyo representative have met with Airwell and Gree representatives and knows that the tooling is to be transferred to Airwell, and Sunwill Precision Plastic Co.) a designee of Airwell) factories in China from Sanyo's locations in China. But Sanyo says it needs a contract just for moving the tooling and for setting the price on which taxes must be paid. Sanyo wants a "low" price stated for the tooling, although the price has already been paid.

a)     The *ostensible* contract is signed on or about December 18, 2009, but states it is effective as of December 10, 2009[5].

b)     Sanyo represents that for GSA to be able to transfer and deliver the tooling, it has to have written permission, and to value the tooling for taxes. PREM did not negotiate and could not negotiate this *ostensible* contract in this situation as it was presented by Sanyo. That situation included the fact that Sanyo was **holding the tooling hostage until the** contract was signed.

---

[5] Unknown to PREM at this time, the timing issue was controlled behind the scenes by Panasonic's July 29, 2010 – *Announcement of Implementation of Tender Offer for Shares SANYO electric Co. Ltd. by Controlling Shareholder Panasonic Corporation and on Recommendation for Shareholders to Tender Shares in Tender Offer*, which offer states that — As set out in the Offeror's later announcement dated December 10, 2009, entitled 'Panasonic Announces the Result of Tender Offer for SANYO Shares of common stock ...

c)      Sanyo's 'delivery' contract now states terms and conditions favorable to Sanyo, made in the name of its Chinese subsidiary as the contract party. PREM signed the 'delivery contract' based on the representations that it was solely for the purpose of delivery and tax valuation.

d)      PREM's permission to the 'delivery' contract was coerced as Sanyo misrepresented not only the purpose of the contract but has PREM in an economic stranglehold as PREM is needing to set up the tooling to be able to manufacture to supply its market demand.

e)      Sanyo, or its subsidiaries or agents failed to perform the terms of the Lubbock contract. Subsequently, Sanyo breached the China contract as well. As such, the real purpose of each contact was to limit Sanyo's liability while obtaining money from PREM.

19.     **PREM discovered that Airwell is not an acceptable re-placement manufacturer.** PREM, through its exchanges of draft MOU's with Airwell learns the following unacceptable information about Airwell at the time Airwell is stating to PREM that Airwell is being frustrated by Sanyo in being able to set up the tooling for manufacturing.

19.1    Airwell intended to sell the product it is making for PREM to a competitor in the market: Fedders North America.

19.2    In an October 30th MOU draft, Airwell wanted any disputes to be resolved under French law in the Court of Versailles, later changed to New York.

19.3    That Airwell defines ownership of proprietary property and its use as being waived if it is in the public domain in such a context that PREM is left with the impression that Airwell has the intention of pirating the advanced designs in the tooling to its benefit and of not honoring  intellectual property rights by setting up beforehand an argument for public domain.

---

Plaintiff's Original Petition          **Page 14 of 29**

19.4    That Airwell was in fact not a viable company, and shortly after an exchange of MOUs it closes its Shenzhen plant. However, due to the harsh and unacceptable terms that Airwell demanded, PREM ceased negotiations in January 2010.

19.5    That Airwell was never a viable option as a replacement manufacturer, was a fact that was either known to Sanyo, or upon the conduct of reasonable due diligence, should have been known to Sanyo. Sanyo recommend Airwell to PREM.

20.    **PREM learned that the tooling had not been delivered, installed, and licensed for use in China, as agreed.** Prior to PREM not approving Airwell as a replacement manufacturer, Sanyo caused **only some of the tooling to be delivered** to Airwell. PREM is in formed by Airwell of the following about the tooling.

20.1    The tooling is incomplete and unusable. Since PREM is not a manufacturer it has no knowledge of whether the tooling delivered was complete or not. Sanyo is notified that the tooling is incomplete. Sanyo refuses to reply.

20.2    Drawings, and schematics, have not been provided. Sanyo is notified.  Sanyo refuses to provide the drawings and schematics.

20.3    Licenses, patents, or other intellectual property assignments (software for programming the main printed circuits boards) required for registration to use the tooling in China have not occurred. Sanyo refuses to provide a list of the patents that need to be licensed.

20.4    Sanyo refuses to explain its errors, omissions, and failures to PREM as to why it or its subsidiary will not honor its Guangdong-Sanyo 'delivery' contract and subsequent oral affirmative representations for the transfer of the tooling. Once Sanyo appears to have secured PREM's buyout the remaining inventory and release its damage claims, it just ceases to perform the delivery and licensing of the tooling.

21.    PREM relies on Sanyo's representations about being able to use the tooling to continue in the market with the Sanyo product in order to protect PREM's net profits and market share rate of growth. In reliance on Sanyo's representations inducing PREM to enter into Lubbock contract, PREM takes out its own trademark brand, PremAire™ – to identify any newly manufactured Sanyo PTACs to its customers as a change in name only.

21.1    **The Chinese enter into short-term manufacturing for PREM:** Without the tooling, and with only limited inventory available, PREM enters into an unsatisfactory short-term arrangement with Gree-China to manufacture PTACs originally designed by Carrier. PREM now makes improvements to the Carrier design, for which the Chinese acquire the knowledge, technology and benefit of PREM engineering, without sharing of intellectual property rights for PREM's contributions.

21.2    For over a year (beginning in March 2010) PREM attempts to have Gree enter into a fair and binding contract for supply of PTACs to PREM. Gree refuses, knowing PREM's Dilemma with the Japanese, and that if PREM can ever get the Sanyo design into production, all other PTACs will be inferior. Gree agrees only to manufacture PTACs for PREM on an order to order basis, with PREM having to undertake most if not all of the liability associated with being a manufacturer (in the United States market) rather then being a distributor as to warranty and products liability.

21.3    Upon information and belief, Gree may be holding out on entering into a contract until PREM engages Gree to manufacture the Sanyo design[6].

22.    Securities and Exchange Commission (United States) gives the go ahead to the SANYO-Panasonic merger in November 2009. Behind Sanyo's dealings with PREM the mega-merger of Sanyo and Panasonic is proceeding to where, on or about November 4,

---

[6] China is the number one violator of intellectual property rights according the Unites States Trade Representatives Office Watch List.

2009, Sanyo's board of directors approves the Tender Offer for shares of Sanyo Electric Co., Ltd by Panasonic Corporation. PREM is not privy to nor informed of these dealings, believing upon the representations made to it by Mr. Mori or Mr. Yamashita that the merger has been completed already.

22.1   Public announcements occur as to agreements for Panasonic's acquisition of all shares of Sanyo on July 29, 2010.

22.2   Panasonic announces on December 21, 2010 that the respective companies executed the Share Exchange Agreement that is to be implemented after the Share Exchange Agreement is approved by resolution of an extraordinary general meeting of the shareholders of SANYO scheduled to be held on March 4, 2011 and Sanyo's publicly traded shares are to be delisted as of March 29, 2011.

23.   PREM repeatedly requests specific performance of the Lubbock tooling contract without success. While the Panasonic-Sanyo merger is proceeding, and having sold the liability of its inventory and receiving money for its tooling, Sanyo ignores PREM's requests regarding the location and delivery of missing tooling and license permissions for its use in China.

23.1   Guangdong-Sanyo breaches its 'delivery' contract. Under China Law, Sanyo's abandonment of its contractual performances violates the principle of *performance in good faith*.

23.2   Further, the agreement was obtained by negligent, false, or fraudulent representations made to PREM and to Chinese citizens depriving the government of employment and income opportunities.

24.   Sanyo breaches the 2002 Contract for SEAC and SAMS; SEAC and SAMS are still under a contractual duty to manufacture and deliver PTACs and parts to PREM for of all of

---

2009 through August of 2010, as the 2002 contract is not terminated. PREM has never approved any substitution of Sanyo or Sanyo-Asia, as contract partners, or agreed to any termination of the 2002 contract.

24.1   **Sanyo finally formally terminates the 2002 contract on August 20, 2010.** SANYO Electric co., Ltd. and SANYO Asia, PTE, Ltd. sign a written formal notice of termination on August 20, 2010, although both entities have never been approved by PREM as a successor, assignee, or transferee party to the SEAC and SAMS 2002 contract. This failure to gain PREM's approval is noted in the termination letter as follows:

> — For avoidance of doubt, SANYO Electric Air Conditioning Co., Ltd. transferred its business of manufacturing packaged air conditioners to SANYO Electric Co., Ltd as of _____ of 2004 and SANYO Air conditioners Manufacturing, Singapore Pte., Ltd. was merged with SANYO Asia Pte. Ltd. as of 1ˢᵗ October 2009 because of which we became parties of the Agreement.

24.2   The August 20, 2010 letter acknowledges that PREM has issues with the manner in which Sanyo has sacrificed PREM in its merger with Panasonic when it states:

> — With regard to the surviving rights and/or obligations of the parties of this Agreement after the termination of this Agreement, the parties shall separately negotiate in good faith.

25.   **PREM responds to the August 20, 2010 termination on November 22, 2010** noting that the Japanese parties breached the agreement before they terminated it, and that the parties who terminated it were unapproved and therefore strangers to the contract with no enforceable rights, including as to termination. At this point, Sanyo or its subsidiaries have breached the 2002 Japan contract, the 2009 Lubbock contract, and the Guangdong-Sanyo 'delivery' contract. Faced with this stark reality of repeated failures to perform contractual

obligations, PREM attempts negotiations. Being frustrated in that approach, PREM takes the following positions.

25.1    PREM objects that termination is not timely or proper. The late timing of the termination letter is apparent as it reveals that there has been an unaccepted substitution of parties, and comes after PREM has been fraudulently induced and positioned by commercial extortion and coercion into arguably foregoing claims under that agreement, or the China 'delivery' contract.

25.2    PREM never waived any condition imposed by Article 23.

25.3    If PREM would have known that SEAC and SAMS were replaced in the 2002 Agreement, at the time of replacement, signaling a change in future performances or other material matters, Prem would have had an opportunity to object and consider its options, rather then being jeopardized and placed in to an untenable later position by commercial extortion in 2009, at the whim of non-parties whose interests were in conflict with the interests and performances of the original parties.

25.4    PREM appoints Lamar Treadwell as its negotiator (by written proxy on March 17, 2011 under Japanese law.)

25.5    PREM makes demand for 90 million dollars (US) for damages.

26.    From November 2011 to June 2011, PREM attempts to negotiate its issues with Sanyo. Mr. Mori and other Sanyo representatives refuse to negotiate, or only want to negotiate upon unacceptable conditions, interposed to keep from negotiating. The purpose of the delay, unknown to PREM, appears to be tied to the merger becoming final by Panasonic acquiring all of the Sanyo shares, or some other veiled interest.

26.1    On June 8, 2011, Sanyo reveals it has hired lawyers.

26.2    PREM learns that the law firm is: MOFO, Morrison/Foerster, Tokyo.

27.     SEAC and SAMS and Guangdong-Sanyo have ratified or by waiver adopted the acts of Sanyo, as its agent, as their own.

28.     All conditions precedent have either been waived or performed.

## I.     CIVIL THEFT
### Texas Theft Liability Act - Theft of Property

29.     The allegations contained in each of the other paragraphs herein are hereby incorporated by reference, as if fully set forth herein. PREM brings this action under the CIVIL PRACTICE AND REMEDIES CODE (CPRC) §134.001, et seq. and TEX. PEN. CODE §31.03(b)(1), theft of personal property; by acquiring or exercising control over property [§31.01(5)], whether tangible or intangible [§31.01(5)(B)], including money [§31.01(5)(C).

30.     **Modus Operandi:**  Sanyo orally contracted for the purchase and sale of the tooling in Lubbock, Texas suitable for manufacturing in China between June and October of 2009, with E-mails serving as memorandum of the negotiations. PREM was misled by Sanyo representations that deceived PREM as to the true nature of Sanyo's final intent, and PREM performed the Lubbock contract by paying the stated price.

30.1    Sanyo representatives undertook further coercion, and Sanyo subsequently demands that PREM enter into a written contract drawn by Sanyo, the terms of which are non-negotiable. Sanyo represented it must have a written contract before being able to transfer or deliver the tooling from "GSA" to Airwell or Gree.

30.2    PREM, now having paid its money, and having changed is position in reliance on Sanyo's representations, needs the tooling to continue to have a supply of PTACS and parts. However, PREM is deceived as to further performances (delivery of the tooling suitable for use) and placed under continuing economic coercion (holding of the tooling) until it signs the China 'delivery' contract. If the contract is truly only for delivery and tax valuation, then the fact that the licensing of the tooling is not mentioned does not immediately concern PREM.

a)   **Sanyo's use of Deception:** Sanyo's representations and conduct consistent created a false impression in PREM that a Lubbock contract in fact existed for the sale of tooling and permission for its use. PREM believed it had ownership rights to the tooling sufficient to cause the tooling to be used and enjoyed.

b)   **Sanyo's promise of performance affecting PREM's payment of money when Sanyo intended not to perform:** Sanyo always represented that PREM would have the tooling necessary for PREM to be able to perform manufacturing under its private label and for warranty. But Sanyo's various actions occurring over time, without adequate justification, evidence knowledge in Sanyo that it did not intend to perform its promise, or knew that it's promise would not be performed in that the **tooling had been withheld from PREM**, its owner, for so extended a time that a major portion of the value or enjoyment of the property is forever lost to PREM.

c)   Unknown to PREM at the time of the Lubbock contract, and upon information and belief, Sanyo ceased production of the PTACS in apparently early 2009 and moved the tooling outdoors, unprotected. When it was discovered that the tooling was incomplete, a meeting occurred with Sanyo. In the presence of Gree factory personnel, Henry Patel, and Rathod Chandra Beck Xu of Gree informed Mr. Yamashita of Sanyo that the tooling was incomplete and in poor condition therefore unsuitable for manufacturing. Mr. Yamashita took photographs. Sanyo never responded to its notification of this issue. Upon information and belief, Sanyo never intended for PREM to be able to effectively use the tooling.

30.3   Upon PREM signing the Guangdong-Sanyo China contract, Sanyo continues to **appropriate the tooling without the effective consent of PREM** by failing to timely and properly deliver the tooling, including all things necessary for the tooling to be able to be used in China. The China 'delivery' contract then is a form of continuing deception by promising a performance affecting the judgment of PREM. Under the totality of the circumstances, evidenced by Sanyo's excuses showing intent or knowledge that it was not going to deliver the tooling, Sanyo deprives PREM of the value of the tooling, and its use and enjoyment.

30.4   The representations made by Mr. Mori and Mr. Yamashita, in Lubbock, Texas, causing payment for the tooling to be authorized by PREM in Lubbock,

---

Plaintiff's Original Petition          **Page 21 of 29**

Texas, as well as the representations made in the China contract, are **false material representations**, as the tooling has never been delivered in any form for use.

31.    PREM repeatedly requested and demanded for the tooling to be completed and delivered to its agents in China and requested the locations of the tooling so it could arrange for the tooling to be collected and delivered to it.

32.    Sanyo fails to timely respond, or to deliver the tooling complete for the purpose of manufacturing in China. Sanyo subsequently admits to PREM and its agents the tooling is incomplete, but fails to otherwise deliver the tooling sufficient for manufacturing.

33.    **Intent to deprive:** The failure to deliver the tooling sufficient for manufacturing, after having sold the tooling, being paid for the tooling in full, and after being notified the tooling has not been delivered as contracted, evidences an <u>intent to deprive</u> PREM of the monies it paid for the tooling (Texas), as well as to deprive PREM of the use of the tooling (China) and for PREM's enjoyment thereof (sales and parts supply in Texas).

33.1    Sanyo, now being fully informed throughout 2010 that its or its subsidiary's (Guangdong-Sanyo) performances were non-conforming and were deficient. That the China contract, as a form of deception misleads PREM as to the true nature of the situation, that is, Sanyo, or its agents never had any intention of delivering the tooling. Sanyo refuses to negotiate, or its offers to do so are not reasonable, showing no regard for the damage its has caused PREM. Sanyo's actions preclude PREM from continuing to service its market in the United States by selling Sanyo PTACS.

33.2    Sanyo is informed by correspondence from PREM's legal counsel of the particulars of non-delivery of the tooling and demand for delivery. Sanyo denies the issues set forth in the notices, while engaging in long delays in replying, which replies represent Sanyo wants to negotiate, although it avoids entering into the negotiating process in good faith by stating an unreasonable demand, i.e. that Mr. Patel be the one negotiating against Sanyo, or he be present.

---

34.   **PREM's Property:** At all times relevant herein, PREM owned the money used to purchase the tooling and held the greater right to possession of the money and the tooling by having paid for the tooling. PREM's ownership of the money involved is documented by its payment and banking transaction receipts, directly or through its offshore representatives, and are prima facie evidence of ownership of the funds at the time the payments were sent to Sanyo and possessed buy it.

34.1   **Sanyo** unlawfully appropriated property, monies paid as United Sates currency, or the tooling it owned sufficient for manufacturing in China, without the effective consent of the owner, PREM.

34.2   Under the circumstances set forth herein **Sanyo** intended to deprive Prem of its money by engaging in deceit, deception, or other artifice to  for the purpose of unlawfully appropriating said monies from PREM. Although requested to specifically perform the delivery of the tooling, sufficient for manufacturing PTACS in China, Sanyo has failed and refuses to do so.

35.   When it used deception or other unlawful means to appropriate PREM's property, Sanyo deprived PREM of the value, use, or enjoyment of the property (money /tooling). Thus, the value or enjoyment of its property so taken was lost to PREM.

36.   **Damages:** PREM prays for an award of the **fair market value** in China, at the time of the taking, of the tooling suitable for manufacturing including for the value of those intellectual property permissions, schematics and drawing/specifications necessary for use of the tooling in China, or in the alternative for the value of the loss of use, to PREM from January 2010 to the present.

36.1   For an additional damage of $1,000 under CPRC §134.005(a)(1).

36.2   For pre-judgment interest, post judgment interest, on all damages proven at trial and for court costs.

---

36.3   For recovery of attorney fees, as the prevailing party in a jury trial, and because in order to bring this claim hiring an attorney was necessary, for which PREM incurred attorney fees, which fees will be shown at trial to be reasonable, at a rate based upon $350.00 per hour for the local are of Lubbock, Texas, and such fees are higher for other courts and jurisdictions.

37.   **PREM prays for the award of exemplary damages** under the TEXAS DAMAGES ACT, CPRC §41.08(c)(13) damages related to Chapter 31 of the Texas Penal Code, i.e., Theft, which is a third degree felony or higher, are without limitation. In this regard, PREM asserts that:

37.1   **Sanyo** acted with a specific purpose to cause substantial injury to PREM in Texas. Sanyo caused commercial injury when it engaged in deceit (concealing or misrepresenting the truth); in deception (obstructing contract performance by knowingly delivering non-usable tooling); by false pretenses by demanding a China contract, (Guangdong-Sanyo) any by using commercial extortion (holding the tooling hostage) to secure its misappropriation of PREM's property, i.e., monies from PREM, and withholding of the use of tooling suitable for use in China, under circumstances amounting to theft of property.

37.2   An exemplary damage award under these circumstances is not unconstitutional, as a matter of law in Texas, when the award is specifically   related to punishing the morally culpable conduct of Defendants.

### J.   Fraudulent Inducement

38.   Pleading in the alternative, the allegations contained in each of the other paragraphs herein are hereby incorporated by reference, as if fully set forth herein, and for joint and several liability.

38.1   PREM brings this action based on the principle that Sanyo had a duty to refrain form inducing PREM to enter into a contract by using false representations,

---

Plaintiff's Original Petition          **Page 24 of 29**

such that PREM entered into a binding contract relying on Sanyo's false representations.

38.2   Neither Sanyo, nor any wholly owned subsidiary, intended to perform any contract, or obligation owed to PREM.

39.   Sanyo, in its course of its business and dealings with PREM, occurring during the time period of the Sanyo-Panasonic merger, which matters of merger were unknown to PREM, Sanyo supplied false information to PREM in Lubbock, Texas that was material, and which was about existing facts, as follows:

39.1   That Sanyo was the owner of the tooling.

39.2   That PREM was purchasing the tooling from Sanyo.

39.3   That the tooling PREM was purchasing was suitable for manufacturing in China.

39.4   That PREM had the right to use the tooling to manufacture PTACS under its private brand that included parts for warranty repair, or replacement.

39.5   That Sanyo would deliver the tooling suitable for manufacturing in China.

39.6   That Sanyo would assist in setting up the tooling to meet manufacturing specifications.

39.7   That Sanyo would use its experience and knowledge of manufacturing to select a suitable replacement manufacturer.

40.   Sanyo did not use reasonable care in either obtaining or ascertaining the facts upon on which it based the information it was communicating. Sanyo's representations were false and were of material fact, of opinion, promises of future performance, and representation by

---

Plaintiff's Original Petition          Page 25 of 29

conduct. In this regard, Sanyo held special knowledge[7] in that Sanyo knew PREM would be relying upon such information given by Sanyo that would be superior to that possessed by PREM and which PREM did not have equal access.

40.1 That is, Sanyo either knew its representations were false at the times they were made to PREM, or made the representations recklessly, as a positive assertions, and without knowledge of the truth.

40.2 Sanyo intended PREM to rely upon and to act upon its representations that PREM had entered into a binding agreement.

40.3 PREM relied upon the representations that there was a binding agreement by:

a) Paying for inventory.

b) Paying money to Sanyo, or its designated agent, for the tooling.

b) By traveling to China.

c) By hiring agents to attempt to set up and use the tooling, re-moving the tooling, and fees for storage.

41. PREM justifiably relied on Sanyo's representations because it was reasonable to do so under Japanese and Asian cultural custom, the nature of the parties' relationship (big brother, younger brother) and the untenable position into which PREM was placed, for which it trusted Sanyo. Sanyo's intent not to perform is made clear from its subsequent conduct of coercion, intentional non-delivery, delay, and manner of negotiating that placed PREM into an untenable position of economic coercion arising out extortion used to obtain unconscionable advantages, including limitation of damages.

---

[7] That is; knowledge of specific facts that underlie a false representation as to the happening of a future event, including a false promise of a future performance where Sanyo had no intention of performing it.

42.    The representations made by Sanyo proximately caused injury to PREM. PREM lost its money paid for out-of-pocket costs and expenses. However, to avoid double recovery, PREM sues for its benefit-of-the-bargain losses, i.e., loss of the use of the tooling and ability to substitute the PremAire brand, as an acceptable substitution to its customers, to maintain and increase sales and for market share.

42.1    Loss of market: PREM was intending to increase sales by 15 million in 2009, and thereafter, to achieve 20% market penetration of a billion dollar market in the United States, a major portion of which is located in Texas, one of the world's largest economies.

42.2    In this regard, PREM sues for loss of good will acquired because of its presence as a well-known business that speaks the Indian dialect of Guajarati, Hindi, English and Spanish spoken in the market of Hotel owners.

42.3    PREM sues for any injury suffered by it that is a natural, probable and foreseeable consequence of defendants' conduct.

a)    In this regard, PREM has been unable to find a suitable manufacturing partner, exposing it to increased risk for products liability issues

b)    In the alternative, for the total destruction of the business at market value, estimated to be not less than 90 million US dollars a result of the non-delivery of the tooling.

K.    Request for Declaratory Judgment Relief

43.    Plaintiff incorporates by reference the factual allegations contained in paragraphs 13 through 28.

44.    The purpose of the TEXAS UNIFORM DECLARATORY JUDGMENTS ACT is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered. TEX. CIV. PRAC. & REM. CODE §37.002(b) A court of record within its jurisdiction has power to declare rights, status,

Plaintiff's Original Petition          Page 27 of 29

and other legal relations whether or not further relief is or could be claimed.   TEX. CIV. PRAC. & REM. CODE §37.003(a)

45.   Pursuant to the TEXAS UNIFORM DECLARATORY JUDGMENTS ACT (TUDJA), TEX. CIV. PRAC. & REM. CODE § 37.001 et seq., Plaintiffs seek a declaratory judgment as follows:

45.1   Whether Sanyo is a lawfully substituted party to the 2002 Japanese contract, or not, such that its August 20, 2009 Notice of Termination to Prem Supply, Inc., or PREM is enforceable or not.

45.2   Whether Sanyo's and Prem's course of dealing in Lubbock, Texas, with written memorandums, and payment performance by PREM constitute a contract.

45.3   Whether Sanyo had the legal right to represent the Guangdong-Sanyo entity in entering into the December 10, 2009 contract for tooling, and

a)   Whether such December 2009 'delivery' Guangdong-Sanyo China contract was obtained through fraud, economic coercion, or commercial extortion, such that it's limitation of damages clauses should not be enforceable against PREM in the United States.

45.4   Whether PREM is subject to arbitration in either China or Japan of any of the issues as presented in this lawsuit.

46.   Plaintiff seeks to recover reasonable and necessary attorney's fees as are equitable and just pursuant to TEX. CIV. PRAC. & REM. CODE § 37.009.

47.   **Refusal to mitigate damages:** PREM offered to negotiate its claims, which claims were set forth, in several communications, for which Sanyo unreasonably refused to mitigate its damages by failing to engage, including under Asian cultural mandates.

### L.   Demand for Jury Trial

48.   Plaintiff hereby demands a jury trial, and tenders the requisite fee.

---

Plaintiff's Original Petition            Page 28 of 29

## M.    PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer, and Plaintiff further prays that upon final hearing the following be entered:

1. That Defendants be found guilty of theft.

2. That the declaratory relief requested by granted in Plaintiff's favor.

3. Judgment against Defendants, jointly and severally, for actual damages sustained by Plaintiff, in the amount of 90 million dollars or in an amount to found and awarded by the jury;

4. Judgment against Defendants, jointly and severally, for exemplary damages in an amount to be determined by the trier of fact;

5. Judgment for Plaintiff to recover his reasonable and necessary attorneys' fees for bringing this case to trial and judgment, as well as a conditional award in the event of an appeal;

6. Judgment for both pre-judgment interest and post-judgment interest at the maximum interest rate allowed by law;

7. Judgment for costs of Court; and

8. Judgment for such other and further relief to which Plaintiff may be justly entitled.

Respectfully Submitted,

Lamar D. Treadwell, Lead Trial Counsel
SBN:  20205000
551 West Cordova Rd., #720
Santa Fe, New Mexico 87505
(505) 660-0602 Cell
(505) 424-0058 Fax

Plaintiff's Original Petition             Page 29 of 29

# Exhibit A

# Meeting  Minitus

Meeting held at Prem Sales office from Jun 5th to Jun 7th Prem Sales: MR. Henry Patel, SANYO: MR. Koji Mori, MR. Susumu Sato, and MR. Tetsushi Yamashita

## "Quality issue for LCDI Power cord"

SANYO explained about investigation report provided to Prem Sales by SANYO on Jun 2nd 2009 by e-mail.

To determine rot#"0705" power cord is main defected rot#, SANYO request Prem that sales history of LCDI service cord from Jan 2007 through May 2009/06/08  >>> SANYO received copy of INVOICE related with LCDI cord

In addition, SANYO request additional sales data with serial# that originally PTAC was sold to customer  >>> Prem Sales will prepare those data in 2 or 3 weeks, Prem will provide those data to SANYO

SANYO will complete study by those data till end of Jun, then provide next step direction to Prem

Prem request SANYO to provide model# and serial# list equipped with "0705" power cord, Prem will prepare customer list based on sales history.

SANYO and Prem will discuss about correspondence based on SANYO findings and directions.

## "PTAC Business issue"

SANYO explained SANYO need to stop PTAC business, and ask PREM to have understanding SANYO situation.

After long discussion about this issue, finally agreed both company about basic idea below.

1)   SANYO will provide new released drawings when developed 3 series except original drawing when developed 2series and 1 series, purpose for PREM need to explain their banker or investor as evidence.
     >>> SANYO will prepare 2 pair of copies

2)   SANYO and PREM will looking for somebody manufacture to produce PTAC using current SANYO PTAC'S die and design.

SANYO explained ELECTRA group is one of possibility.

PREM agreed SANYO will proceed of discussion with ELECTRA.

PREM's expectation for this scheme is,

>>>New partner should be like a company available to building long term business relation.

>>>Brand should be "PREM" brand

>>>PREM consider that will sell under "PREM" brand for equivalent q'ty that currently

60

PREM sell SANYO, LG and GE branded PTAC. (Totally about 40,000 pcs)
Idea of scheme

(1)   SANYO and ELECTRA will have engineering support agreement
      SANYO and PREM will have sales and purchase agreement for die (Prem will
      purchase current die)

(2)   ELECTRA will manufacture and provide "PREM" branded PTAC : OEM agreement

(3) SANYO and PREM will have after sales service agreement for current SANYO branded
      PTAC placed in the market. PREM will take care after service of SANYO branded
      PTAC

(4)   ELECTRA will provide PREM service parts for SANYO branded PTAC after service

"Inventory in SANYO factory"
SANYO have completed PTAC inventory in the factory: 4,094 SANYO have parts
inventory for future production in the factory:   6,062 PREM agree to buy all of above
inventory until Sep or OCT 2009 under condition of SANYO requested.
(Condition 1): PREM will buy PTAC through SANYO sales company with certain payment
term (length of payment terms will be decided later) All shipment will ship from factory
direct to PREM warehouse.
Price to PREM will continue current FOB price level.
(Condition 2): When condition 1 has any difficulty, SANYO will contact trading company.
SANYO will sell trading company.
Trading company will sell PREM.
Both above cases, SANYO and PREM agree not to through Veelam.

Till above (Condition1) or (Condition2) will be prepared, PREM will continue to buy under
current condition and sales route.
PREM will prepare cash in advance for 8 containers before end of Jun 2009.
Maybe 8 containers will divide 4 containers and 4 containers under separate shipment.